**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

PLANNED PARENTHOOD OF GREATER TEXAS §
SURGICAL HEALTH SERVICES, PLANNED §
PARENTHOOD CENTER FOR CHOICE, §
PLANNED PARENTHOOD SEXUAL §
HEALTHCARE SERVICES, PLANNED §
PARENTHOOD WOMEN'S HEALTH CENTER, §
WHOLE WOMAN'S HEALTH, AUSTIN §
WOMEN'S HEALTH CENTER, KILLEEN §  CIVIL ACTION
WOMEN'S HEALTH CENTER, §
SOUTHWESTERN WOMEN'S SURGERY §  CASE NO. 1:13-cv-862
CENTER, WEST SIDE CLINIC, INC., ROUTH §
STREET WOMEN'S CLINIC, HOUSTON §
WOMEN'S CLINIC, each on behalf of itself, its §
patients and physicians, ALAN BRAID, M.D., §
LAMAR ROBINSON, M.D., PAMELA J. §
RICHTER, D.O., each on behalf of themselves and §
their patients; §
     Plaintiffs, §
 §
v. §
 §
GREGORY ABBOTT, Attorney General of Texas; §
DAVID LAKEY, M.D., Commissioner of the Texas §
Department of State Health Services; MARI §
ROBINSON, Executive Director of the Texas §
Medical Board; DAVID ESCAMILLA, County §
Attorney for Travis County; CRAIG WATKINS, §
Criminal District Attorney for Dallas County; §
DEVON ANDERSON, District Attorney for Harris §
County; MATTHEW POWELL, Director of the §
Lubbock County Criminal District Attorney's Office; §
JAMES E. NICHOLS, County Attorney for Bell §
County; JOE SHANNON, JR., Criminal District §
Attorney for Tarrant County; RENÉ GUERRA, §
Criminal District Attorney for Hidalgo County; §
SUSAN D. REED, Criminal District Attorney for §
Bexar County; ABELINO REYNA, Criminal District §
Attorney for McLennan County; JAIME ESPARZA, §
District Attorney for El Paso County; each in their §
official capacities, as well as their employees, agents, §
and successors, §
     Defendants. §

<u>**COMPLAINT AND APPLICATION FOR PRELIMINARY AND PERMANENT
INJUNCTION**</u>

Plaintiffs, by and through their undersigned attorneys, bring this complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof allege the following:

## I.      PRELIMINARY STATEMENT

1.      Plaintiffs are Texas health care providers who bring this civil rights action, seeking a declaratory judgment and preliminary and permanent injunctive relief, on behalf of themselves, their physicians, and their patients seeking abortions, under the United States Constitution and 42 U.S.C. § 1983, to challenge portions of Texas House Bill No. 2 ("the Act"),[1] which has the purpose and effect of forcing health centers throughout the state to stop providing abortions. Act of July 18, 2013, 83rd Leg., 2nd C.S., ch. 1, Tex. Gen. Laws. The Act imposes medically unwarranted and burdensome requirements that will dramatically reduce access to abortion in Texas. The Act's requirements are also unconstitutionally vague and unintelligible. Rather than protecting women's health, the Act will harm Texas women. It will also violate Plaintiffs' and their patients' rights guaranteed by the Fourteenth Amendment to the United States Constitution.

2.      The Act requires that all physicians have "active admitting privileges" at a hospital providing obstetrical or gynecological health care services not further than 30 miles from the location at which an abortion is performed or induced (the "admitting privileges requirement"), requires providers to follow the now-outdated medication abortion regimen approved by the U.S.

---

[1] A copy of the Act is attached hereto as Exhibit 1. The Act adds sections 171.0031, 171.041-048, and 171.061-064 to the Texas Health and Safety Code. The Act amends sections 245.010 and 245.011 of the Texas Health and Safety Code. The Act amends sections 164.052 and 164.055 of the Texas Occupations Code.

Food and Drug Administration in 2000 (the "medication abortion restrictions"), and mandates that "the minimum standards for an abortion facility must be equivalent to the minimum standards . . . for ambulatory surgical centers" (the "ambulatory surgical center requirement").[2]

3.   The Act was signed by Governor Rick Perry on July 18, 2013. The admitting privileges and medication abortion restrictions take effect October 29, 2013. *See* Act at sec. 12.

4.   If the medication abortion restrictions and admitting privileges requirement are allowed to take effect on October 29, more than one-third of the state's licensed abortion facilities will be forced to stop offering abortions altogether, eliminating services entirely in Fort Worth, Harlingen, Killeen, Lubbock, McAllen, and Waco. Other facilities will be forced to decrease the number of abortions they provide. Many women will be unable to obtain a medication abortion. This will be devastating for Texas women, particularly low-income women, women who are victims of rape or abuse, women who need abortions later in pregnancy, and those who live outside of major metropolitan areas. As a practical matter, women living west of Interstate 35 and East of El Paso will not have real access to abortions. At least 1 in 12 women will have to travel more than 100 miles to obtain abortion care. As a result, some women will be unable to obtain abortion care.

5.   These requirements, individually and taken together, violate the constitutional rights guaranteed to both Plaintiffs and their patients by the Fourteenth Amendment to the United States Constitution. Preliminary and permanent injunctive relief is necessary to protect the health of the women of Texas and the constitutional rights of Plaintiffs and their patients.

---

[2] The Act's ambulatory surgical center requirement does not go into effect until September 1, 2014, and the Texas Department of State Health Services, which is required to promulgate regulations implementing the ambulatory surgical center requirement by January 1, 2014, has not yet done so. *See* Act at sec. 11. Plaintiffs, in this action, do not challenge the ambulatory surgical center requirement. Nor do plaintiffs, in this action, challenge that portion of Section 3 of the Act which adds Subchapter C to Chapter 171 of the Texas Health and Safety Code.

## II. JURISDICTION AND VENUE

6. Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343(a)(3).

7. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

8. Venue is appropriate under 28 U.S.C. § 1391(b)(1) because some Defendants reside in this district.

## III. PLAINTIFFS

9. Plaintiff Planned Parenthood of Greater Texas Surgical Health Services ("PP Greater Texas") provides a range of reproductive health care services, including contraception and medication and surgical abortions at licensed abortion facilities in Dallas and Waco, and at licensed ambulatory surgical centers ("ASCs") in Austin and Fort Worth. Some, but not all, of the physicians providing abortions for PP Greater Texas have admitting privileges at hospitals within 30 miles of its facility in Dallas, but none of its physicians have privileges within 30 miles of any of the three other facilities. Thus, if the Act takes effect, PP Greater Texas will be unable to offer abortions in Waco, where it is the only abortion provider, or Austin and Fort Worth, where it is the only provider licensed as an ASC and therefore, the only provider able to provide abortions at 16 weeks of pregnancy or greater. PP Greater Texas provides medication abortions through 63 days gestation, as measured from the first day of the woman's last menstrual period ("LMP"), using an evidence-based protocol different from the one that appears on the Food and Drug Administration ("FDA") final printed labeling ("FPL") for the drug mifepristone. PP Greater Texas sues on its own behalf and on behalf of its patients seeking abortions, and its physicians.

4

10.    Planned Parenthood Center for Choice ("PP Houston") provides a range of reproductive health care services, including contraception and medication and surgical abortions at a licensed ASC in Houston. PP Houston provides medication abortions through 63 days LMP using an evidence-based protocol different from the one on the mifepristone FPL. Until approximately a month ago, PP Houston offered medication, but not surgical, abortions at its Stafford health center, and it would again but for the Act. PP Houston sues on its own behalf and on behalf of its patients seeking abortions, and its physicians.

11.    Planned Parenthood Sexual Healthcare Services ("PP San Antonio") provides a range of reproductive health care services, including abortions, at three licensed abortion facilities in San Antonio. At one facility, PP San Antonio offers both surgical and medication abortions. At the other two, it offers medication abortion only. If the medication abortion provisions of the Act are allowed to take effect, PP San Antonio will stop providing abortions altogether at those two facilities. PP San Antonio provides medication abortions through 63 days LMP using an evidence-based protocol different from the one on the mifepristone FPL. PP San Antonio sues on its own behalf and on behalf of its patients seeking abortions, and its physicians.

12.    Planned Parenthood Women's Health Center ("PP Lubbock") provides surgical and medication abortions through 63 days LMP using an evidence-based protocol different from the one on the mifepristone FPL at its licensed abortion facility in Lubbock. PP Lubbock is the only abortion provider in that city. PP Lubbock does not, and cannot, employ a physician with admitting privileges within 30 miles from its health center, and therefore, if the admitting privileges requirement takes effect, abortion services will no longer be available in Lubbock. Even if the admitting privileges requirement were enjoined, the Act's medication abortion

provisions would force PP Lubbock to cease providing medication abortions. PP Lubbock sues on its own behalf and on behalf of its patients seeking abortions, and its physicians.

13.   Plaintiff Whole Woman's Health ("WWH") provides a range of reproductive health care services, including contraception and medication and surgical abortions at its licensed abortion facilities in Austin, Beaumont, Fort Worth, McAllen, and San Antonio, and at its licensed ambulatory surgical center in San Antonio. Some, but not all of the physicians providing abortions for WWH have admitting privileges at hospitals within 30 miles of the locations at which they provide abortions. If the admitting privileges requirement of the Act is allowed to take effect, WWH will stop providing abortions altogether at its Fort Worth, McAllen, and San Antonio facilities. WWH provides medication abortions through 63 days LMP using an evidence-based protocol different from the one on the mifepristone FPL at each of its locations. WWH sues on its own behalf and on behalf of its patients seeking abortions, and its physicians.

14.   Plaintiff Austin Women's Health Center ("AWHC") and Killeen Women's Health Center ("KWHC)" provide a range of reproductive health services, including medication and surgical abortions at licensed abortion facilities in Austin and Killeen. Neither of the physicians providing abortions at KWHC have admitting privileges at a hospital within 30 miles of KWHC and, therefore, if the Act is allowed to take effect, abortions will no longer be available in Killeen, as KWHC is the only provider there. AWHC and KWHC provide medication abortions through 63 days LMP at each location using an evidence-based protocol different from the one on the mifepristone FPL. AWHC and KWHC sue on their own behalf and on behalf of their patients seeking abortions, and their physicians.

15.   Plaintiff Southwestern Women's Surgery Center ("SWSC") provides a range of reproductive health services, including medication and surgical abortions at its ambulatory

surgical center in Dallas. Some, but not all, of the physicians providing abortions for SWSC have admitting privileges at hospitals within 30 miles of the facility. SWSC provides medication abortions through 63 days LMP using an evidence-based protocol different from the one on the mifepristone FPL. SWSC sues on its own behalf and on behalf of its patients seeking abortions, and its physicians.

16.    Plaintiff West Side Clinic, Inc. ("West Side") provides a range of reproductive health services, including medication and surgical abortion services at its licensed abortion facility in Fort Worth. The sole physician providing abortions at West Side does not have privileges at a hospital within 30 miles of the facility, and therefore if the admitting privileges requirement is allowed to take effect, it will stop providing abortions. West Side provides medication abortions through 49 days LMP using an evidence-based protocol different from the one on the mifepristone FPL. West Side sues on its own behalf and on behalf of its patients seeking abortions, and its physician.

17.    Plaintiff Routh Street Women's Clinic ("Routh Street") provides a range of reproductive health services, including medication and surgical abortions at its licensed abortion facility in Dallas. Only one of the two physicians providing abortions at Routh Street has admitting privileges at a hospital within 30 miles of the facility. If the admitting privileges requirement is allowed to take effect, Routh Street will be forced to provide far fewer abortions than it currently is able to perform. Routh Street provides medication abortions through 49 days LMP using an evidence-based protocol different from the one on the mifepristone FPL. Routh Street sues on its own behalf and on behalf of its patients seeking abortions, and its physicians.

18.    Plaintiff Houston Women's Clinic provides a range of reproductive health services, including medication and surgical abortions at its licensed abortion facility in Houston. Houston

Women's Clinic provides medication abortions through 49 days LMP using an evidence-based protocol different from the one on the mifepristone FPL. Houston Women's Clinic sues on its own behalf and on behalf of its patients seeking abortions, and its physician.

19.     Plaintiff Alan Braid, M.D. is a physician licensed to practice medicine in the State of Texas and is board-certified in obstetrics and gynecology. Dr. Braid owns Alamo Women's Reproductive Services, PLLC, a licensed abortion facility in San Antonio where he provides a range of reproductive health services including medication and surgical abortions. Dr. Braid provides medication abortions through 63 days LMP using an evidence-based protocol different from the one on the mifepristone FPL. Dr. Braid sues on his own behalf and on behalf of his patients seeking abortions.

20.     Plaintiff Lamar Robinson, M.D. is a physician licensed to practice medicine in the State of Texas with over 28 years of experience in reproductive health care, including abortion. Dr. Robinson provides medication and surgical abortions at his licensed abortion facility in Dallas, Abortion Advantage, and in several other locations in Texas, including at facilities operated by other Plaintiffs. Dr. Robinson does not have admitting privileges at any hospital, and therefore if the admitting privileges requirement takes effect, he will be forced to stop providing abortion care. Dr. Robinson provides medication abortions through 56 or 63 days LMP, depending on the facility, using an evidence-based protocol different from the one on the mifepristone FPL. Dr. Robinson sues on his own behalf and on behalf of his patients seeking abortions.

21.     Plaintiff Pamela J. Richter, D.O., is a physician licensed to practice medicine in the State of Texas and has been providing reproductive health care, including abortion, for over 20 years. She is currently providing a range of reproductive health services including surgical and

medication abortions at El Paso Reproductive Services. Dr. Richter does not have admitting privileges at any hospital, and therefore if the admitting privileges requirement takes effect, she will be forced to stop providing abortion care. Dr. Richter provides medication abortions through 66 days LMP using an evidence-based protocol different from the one on the mifepristone FPL. Dr. Richter sues on her own behalf and on behalf of her patients seeking abortions.

## IV.   DEFENDANTS

22.   Defendant Gregory Abbott is the Attorney General of Texas. He is empowered to assist county and district attorneys in the prosecution of misdemeanors—and therefore criminal violations of the Act, *see* Act at sec. 2—in Texas. He is sued in his official capacity and may be served with process at 209 West 14th Street, 8th Floor, Austin, Texas 78701.

23.   Defendant David Lakey, M.D., is the Commissioner of the Texas Department of State Health Services ("the Department" or "DSHS"). The Department is generally charged with enforcement of the provisions of Chapter 171 of the Texas Health and Safety Code. Tex. Health & Safety Code § 171.005. Commissioner Lakey is sued in his official capacity, and may be served with process at 1100 West 49th Street, Austin, Texas 78756-3199.

24.   Defendant Mari Robinson is the Executive Director of the Texas Medical Board ("the Board"). The Board is empowered to undertake disciplinary proceedings against a physician who violates certain requirements of the Act. *See* Act at sec. 3 (*to be codified at* Tex Health & Safety Code §171.062); *see also* Act at sec. 6 (*to be codified at* Tex. Occ. Code § 164.052(a)). Ms. Robinson is sued in her official capacity, and may be served with process at 333 Guadalupe, Tower 3, Suite 610, Austin, Texas 78701.

25.   Defendant David Escamilla is the County Attorney for Travis County. He is responsible for prosecuting misdemeanors—and therefore criminal violations of the Act, *see* Act

9

at sec. 2—occurring in Travis County. He is sued in his official capacity, and may be served with process at 314 West 11th Street, Room 300, Austin, Texas 78701.

26.    Defendant Craig Watkins is the Criminal District Attorney for Dallas County. He is responsible for prosecuting misdemeanors—and therefore criminal violations of the Act, *see* Act at sec. 2—occurring in Dallas County. He is sued in his official capacity, and may be served with process at 133 North Riverfront Boulevard, LB 19, Dallas, Texas 75207.

27.    Defendant Devon Anderson is the District Attorney for Harris County. She is responsible for prosecuting misdemeanors—and therefore criminal violations of the Act, *see* Act at sec. 2—occurring in Harris County. She is sued in her official capacity, and may be served with process at the District Attorney's Office of Harris County, Criminal Justice Center, 1201 Franklin Street, Houston, Texas 77002.

28.    Defendant Matthew Powell is the Director of the Lubbock County Criminal District Attorney's Office. He is responsible for prosecuting misdemeanors—and therefore criminal violations of the Act, *see* Act at sec. 2—occurring in Lubbock County. He is sued in his official capacity, and may be served with process at the Lubbock County Court House, 904 Broadway Street, 2nd Floor, Lubbock, Texas 79408.

29.    Defendant James E. Nichols is the County Attorney for Bell County. He is responsible for prosecuting misdemeanors—and therefore criminal violations of the Act, *see* Act at sec. 2—occurring in Bell County. He is sued in his official capacity and may be served with process at the Bell County Justice Center, 1201 Huey Road, Belton, Texas 76513.

30.    Defendant Joe Shannon, Jr. is the Criminal District Attorney for Tarrant County. He is responsible for prosecuting misdemeanors—and therefore criminal violations of the Act, *see* Act at sec. 2—occurring in Tarrant County. He is sued in his official capacity, and may be

served with process at the Tim Curry Criminal Justice Center, 401 West Belknap Street, Fort Worth, Texas 76196-0201.

31.     Defendant René Guerra is the Criminal District Attorney for Hidalgo County. He is responsible for prosecuting misdemeanors—and therefore criminal violations of the Act, *see* Act at sec. 2—occurring in Hidalgo County. He is sued in his official capacity, and may be served with process at 100 North Closner Blvd., Room 303, Edinburg, Texas 78539-3563.

32.     Defendant Susan D. Reed is the Criminal District Attorney for Bexar County. She is responsible for prosecuting misdemeanors—and therefore criminal violations of the Act, *see* Act at sec. 2—occurring in Bexar County. She is sued in her official capacity, and may be served with process at 101 West Nueva Street, 4th Floor, San Antonio, Texas 78205-3406.

33.     Defendant Abelino Reyna is the Criminal District Attorney for McLennan County. He is responsible for prosecuting misdemeanors—and therefore criminal violations of the Act, *see* Act at sec. 2—occurring in McLennan County. He is sued in his official capacity, and may be served with process at 219 North 6th Street, Suite 200, Waco, Texas 76701.

34.     Defendant Jaime Esparza is the District Attorney for El Paso County. He is responsible for prosecuting misdemeanors—and therefore criminal violations of the Act, *see* Act at sec. 2—occurring in El Paso County. He is sued in his official capacity, and may be served with process at El Paso County Courthouse, 500 East San Antonio Avenue, Room 201, El Paso, Texas 79901-2419.

V.      FACTUAL ALLEGATIONS

Challenged Provisions of the Act

35.     Section 2 of the Act, described above as the admitting privileges requirement, mandates that a physician performing or inducing an abortion "must, on the date the abortion is

performed or induced, have active admitting privileges at a hospital" that is not further than 30

miles from the location of the abortion and that provides obstetrical or gynecological health care

services. Any physician who violates these provisions commits a Class A misdemeanor offense

punishable by a fine of up to $4,000, in addition to being subject to license revocation, and

rendering the abortion facility subject to license revocation. *See* Act at sec. 2 (*to be codified at*

Tex. Health & Safety Code § 171.0031, Tex. Occ. Code § 164.055(a)); 25 Tex. Admin. Code

§ 139.32.

     36.    That portion of Section 3 of the Act which adds Subchapter D to Chapter 171 of the

Texas Health and Safety Code, described above as the medication abortion restrictions, provides

that a physician cannot "give, sell, dispense, administer, provide, or prescribe an abortion-

inducing drug" to a patient unless "the provision, prescription, or administration . . . satisfies the

protocol tested and authorized by the United States Food and Drug Administration as outlined in

the final printed label of the abortion-inducing drug." The only exception to the FDA

requirement is that a "person may provide, prescribe, or administer the abortion-inducing drug in

the dosage amount prescribed by the clinical management guidelines defined by the American

Congress of Obstetricians and Gynecologists [("ACOG")] Practice Bulletin as those guidelines

existed on January 1, 2013." In addition, this Section of the Act not only mandates that a

physician examine the patient before prescribing an "abortion-inducing drug," but also that only

physicians may give, dispense, administer, or provide such a drug to a woman. The physician

must also ensure that a follow-up visit is scheduled "to occur not more than 14 days after the

administration or use of the drug" at which "the physician must: (1) confirm that the pregnancy

is completely terminated; and (2) assess the degree of bleeding." Any violation of the medication

abortion restrictions subjects a physician to administrative and disciplinary penalties, including

possible license revocation. *See* Act at sec. 3 (*to be codified at* Tex. Health & Safety Code §
171.064).

Abortion Background

37.    Legal abortion is an incredibly safe medical procedure; it is one of the safest
procedures in contemporary medical practice. Major complications from abortion are extremely
rare. Abortion through the 21st week of pregnancy is significantly safer than continuing a
pregnancy to term and giving birth.

38.    Women seek abortions for a variety of medical, psychological, emotional, familial,
economic, and personal reasons. Approximately one in three women in the United States will
have an abortion by age 45. Most women having abortions (61%) already have at least one child,
and 66% plan to have children when they are older, financially able to provide for them, and/or
in a supportive relationship with a partner so their children will have two parents.

39.    The vast majority of abortions in Texas are performed in the first trimester or first
13.6 weeks of pregnancy LMP. Over half of the abortions reported by the Texas Department of
State Health Services for Texas residents during each of the years from 2001 through 2008
occurred at eight or fewer weeks LMP and over three-fourths of the procedures were performed
at ten weeks LMP or earlier.

40.    Abortions may be performed by surgical or medical means. In the United States,
women obtaining medication abortions generally receive two prescription drugs: mifepristone
and misoprostol. Mifepristone, commonly known as "RU-486" or by its commercial name
Mifeprex, works by blocking the hormone progesterone, which is necessary to maintain
pregnancy. Under current practice, the patient takes the mifepristone at her health care facility
and approximately 24 to 48 hours later at a location of her choosing, she takes a second

medication, misoprostol (known commercially as Cytotec), which causes the uterus to contract and expel its contents, thereby completing the abortion. Used together, these two medications—mifepristone and misoprostol—provide an extremely safe and effective method of abortion. Medication abortions are typically available through 63 days LMP.

41.    The other means of abortion is referred to as "surgical," although this is something of a misnomer because the term "surgical" generally refers to procedures requiring an incision, which "surgical" abortion is not. Surgical abortions are almost always done in an outpatient setting. Surgical abortion procedures are done through insertion of instruments through the vagina and into the uterus. The procedure is short in duration, typically lasting about five to eight minutes for a first trimester abortion.

42.    Many physicians in Texas who provide abortions do so at more than one location. In less populous areas, abortion services are often only provided on a limited basis, and a physician is present in the facility only on the days when abortions are performed. These physicians may travel from other locations to provide abortion services.

43.    Some physicians maintain other practices in addition to their abortion practice and are available to the abortion facilities they work with only on a limited basis. This results in some facilities utilizing several physicians, each on a part-time basis.

44.    It is difficult to recruit physicians to work in abortion facilities because of hostility towards abortion, and because physicians who provide abortions have been the target of protests and violence against themselves and their families. Many physicians who provide abortions therefore cannot live in the same community as the health centers at which they work, for fear of such harassment. As a result, many abortion facilities do not have local physicians willing to

work there and are only able to provide abortion services because physicians living elsewhere are willing and able to travel to the health center.

Existing Regulatory Framework for Abortion in Texas

45.    In Texas, abortions are performed primarily in clinics licensed as abortion facilities or licensed ambulatory surgical centers. The clinics that Plaintiffs operate are licensed abortion facilities or ambulatory surgical centers. There are currently approximately thirty-six licensed facilities in Texas that perform approximately 80,000 abortions altogether every year.

46.    The provision of abortion services in Texas is subject to extensive regulation. First, a woman must undergo a mandatory state-directed counseling session provided in part by the physician who will perform the procedure at least 24 hours before the abortion. Unless she lives more than 100 miles from any abortion provider, this session must take place in person. *See* Tex. Health & Safety Code § 171.012 *et seq*.

47.    The woman must also undergo a mandatory ultrasound, and the physician who is to perform the abortion must show and describe the ultrasound image to the woman. If the woman lives within 100 miles of any abortion provider, she must wait 24 hours after the ultrasound before undergoing the procedure. *Id.* She may waive the 24-hour waiting period by certifying that she lives more than 100 miles from any licensed abortion provider. *Id*.

48.    Any facility where ten or more abortions are performed in a month must be licensed as an abortion facility. Tex. Health & Safety Code § 245.003. Licensed abortion facilities are subject to extensive regulations addressing patient care, infection control, personnel, physician qualifications, emergency protocols, recordkeeping, reporting, and physical plant requirements. *See* Tex. Health & Safety Code § 171.001 *et seq*.; 5 Tex. Admin. Code § 139.41 *et seq*. All

abortion facilities are subject to unannounced on-site inspections by the Texas Department of State Health Services at least once per year. 5 Tex. Admin. Code § 139.31.

49.    Any abortion where the gestational age is 16 weeks or greater must be performed in an ambulatory surgical center or in a hospital licensed to perform the abortion. Tex. Health & Safety Code § 171.004. Like all ASCs, these facilities are subject to extensive regulations addressing patient care, infection control, personnel, physician qualifications, emergency protocols, recordkeeping, reporting, and physical plant requirements. *See* 25 Tex. Admin. Code § 135.

<u>The Impact of the Admitting Privileges Requirement</u>

50.    If allowed to take effect on October 29, the admitting privileges requirement will force over one-third of the state's approximately thirty-six licensed facilities where abortions are performed to stop providing those services, thereby dramatically reducing abortion access throughout the state. It will cause the sole abortion facilities in Lubbock, Waco, Killeen, Harlingen, and McAllen to cease providing abortions and all three providers in Fort Worth to stop, thereby completely eliminating abortion services in those cities and forcing women— especially those in west Texas—to travel enormous distances in order to access abortion services, which will prevent some women from obtaining an abortion. At least 1 in 12 women would have to travel more than 100 miles to obtain abortion care. Even for those facilities that can stay open, not all of their physicians have, or will have privileges as of October 29, meaning that they will be forced to serve more women with fewer providers, which is likely to force women to wait for an abortion, which, in turn, increases the risk of the procedure.

51.    The admitting privileges requirement is medically unwarranted because abortion care is so safe that it very rarely requires hospitalization, and even in those rare instances where

hospitalization follows, Plaintiffs' current practices are more than adequate to ensure patient safety and comport with the standard of care for outpatient procedures.

52.     Serious complications from abortion are exceedingly rare. Nationwide, less than 0.3% of abortion patients experience a complication that requires hospitalization. In the vast majority of cases, complications can be safely and appropriately managed at the health center.

53.     All licensed abortion facilities are already required to have written discharge instructions which they must provide to each patient. Those instructions must contain a list of complications that warrant contacting the facility, and a statement of the facility's plan to respond to the patient in the event of any of the listed complications. The patient also must be able to contact the facility and reach a health care professional on a 24-hour basis by telephone answering machine or service. 25 Tex. Admin. Code § 139.57.

54.     Existing regulations of abortion facilities also require that they "have a readily accessible written protocol for managing medical emergencies and the transfer of patients requiring further emergency care to a hospital," as well as a "working arrangement" with a physician with admitting privileges at a local hospital "to ensure the necessary back up for medical complications." 25 Tex. Admin. Code § 139.56(a). Similarly, ambulatory surgery centers must have written transfer agreements with a hospital to effect immediate transfer of patients, unless all of the physicians performing surgery have admitting privileges at a local hospital. 25 Tex. Admin. Code § 135.4(c)(11)(B).

55.     In the unlikely event that a patient experiences a serious complication that requires hospitalization while at Plaintiffs' abortion facilities, Plaintiffs would transfer her by ambulance to a nearby hospital that is accepting patients.

56.    If a patient experiences a complication after she has left the facility following a surgical abortion, or during a medication abortion (which would not occur at the health center), and she contacts the provider, in most cases her concerns or complications can be addressed over the telephone by a qualified health care professional, or through a return visit to the health center. In the rare instances where additional or after-hours care is necessary, Plaintiffs will refer the patient to a local emergency room.

57.    Whether the abortion provider has admitting privileges at that hospital does not affect the quality of care that the patient receives. Hospital emergency rooms are capable of handling any complications arising from abortion, and will involve an appropriate specialist, such as an obstetrician-gynecologist, if needed. Continuity of care can be maintained by direct telephone communication between the abortion provider and the emergency room physician, but does not require that the abortion provider have admitting privileges. This is standard medical practice and will ensure that the emergency room physician is aware of the extent of the complication, prior treatment, and medication received.

58.    Many of Plaintiffs' patients travel substantial distances to receive abortion care at their facilities. If a patient experiences a serious complication when she is not at the facility, the appropriate course of action would be for her to go to the nearest emergency room. For many of these patients, the nearest emergency room would not be one within 30 miles of the abortion facility, rendering it irrelevant whether her physician has admitting privileges at a hospital within 30 miles of the facility.

59.    Many physicians providing abortions in Texas, including some physician Plaintiffs and some physicians who work with the provider Plaintiffs, do not have admitting privileges at a hospital within 30 miles of the abortion facility. Whether or not a physician has privileges is

dictated in part by the nature of his or her practice. Physicians who, in addition to providing abortions, also maintain active obstetric or gynecological practices, may frequently utilize hospital services and therefore maintain privileges. Because abortion provision is so safe, however, physicians who primarily perform abortions only rarely have a patient that needs to go to the hospital, and therefore often do not have admitting privileges. In some instances, physicians may have privileges in one location, but not in another location where they travel to perform abortions on a part-time basis.

60. The admitting privileges requirement of the Act effectively gives local hospitals veto power over Plaintiffs' ability to provide abortion care to women in Texas. The physicians applying for privileges cannot control whether any local hospital will grant their applications, and accordingly cannot control whether they are in compliance with the Act. Hospitals in Texas have broad discretion to set the qualifications for their medical staff and in the granting of privileges, and can thereby grant or refuse privileges on the basis of their own rules and regulations. *See* Tex. Health & Safety Code § 241.101. Accordingly, the admitting privileges requirement makes Plaintiffs' ability to provide abortion services subject to the discretion of local hospitals.

61. Hospitals within Texas have varying requirements for privileges. Some require a certain number of patient admissions each year, some require physicians to reside within a certain distance from the hospital, others limit privileges to physicians who are directly employed by or under contract with the hospital, while still others require board certification. These criteria, unrelated to a physician's ability to provide high-quality abortion care, may nonetheless preclude him or her from obtaining privileges.

62.     Shortly after the Act was signed into law and in many cases before it was signed, the physician Plaintiffs and the physicians who provide abortions at the provider Plaintiffs who do not have privileges within 30 miles of their facilities began the process of applying for privileges.

63.     Prior to submitting an application for privileges, a physician must first request an application, or possibly a "pre-application," from the hospital, along with a copy of the by-laws or other documents specifying the requirements for privileges.

64.     Once an application for privileges is submitted, hospitals in Texas, by law, are granted up to 170 days from receipt of an application to inform a physician about the decision on the application. *See* Tex. Health & Safety Code § 241.101(k).

65.     Plaintiffs are undertaking efforts to obtain privileges for themselves and physicians who work at their facilities, but not all of them have been able to secure privileges at this time. Indeed, for some it is unlikely that they will even receive notice as to whether their application is granted until well after the Act takes effect.

66.     Compliance with the admitting privileges provision is complicated by the fact that the Act requires "active admitting privileges," but this term is not defined in the Act. Many hospitals have different levels of medical staff, including "Active" medical staff and Courtesy or Consulting staff, all of whom can admit patients. It is unclear whether the Act requires physicians to become members of a hospital's "Active" medical staff or rather requires them to have admitting privileges that are "active" in the sense of being current and unexpired. Thus, Plaintiffs cannot be sure if the privileges they have or are seeking to obtain will bring them into compliance with the admitting privileges requirement. Becoming a member of "Active" staff may require a larger minimum number of patient admissions per year, greater involvement with hospital affairs, being a full-time hospital staff member, and in many cases, serving as a

provisional staff member for at least one year, making it burdensome or impossible for many physicians who work at Plaintiffs' facilities to gain "Active" status, and certainly to do so by October 29.

<u>The Impact of the Medication Abortion Restrictions</u>

67.    Under current practice, and for the past decade, Texas women with gestational ages through at least 63 days LMP have had the option of choosing between a surgical procedure that takes place in the health center (surgical abortion) or a procedure using medications alone, which can be completed at a private location of the woman's choosing (medication abortion). Both are extremely safe and effective procedures.

68.    The Act dramatically restricts women's access to medication abortion. While the Act's medication abortion restrictions are written in an unclear and unintelligible manner, they seem to ban the procedure entirely after 49 days LMP, denying women a safe and effective procedure for no medical reason. For some women with certain medical conditions, the Act's denial of access to medication abortion will significantly threaten their health. For women with gestational ages through 49 days LMP who choose medication abortion, the Act seems to force them to have an outdated, less effective procedure that will have increased side effects. It also greatly increases the cost of the procedure and imposes unnecessary burdens, some of which also pose risks to their health.

69.    Women choose medication abortion for a variety of reasons. Many women choose medication abortion because they fear any operation, even surgical abortion, which, as discussed above, does not require an incision. Some women fear or do not wish to undergo even the moderate anesthesia that may be given in conjunction with surgical abortion. Medication abortion, which does not require instruments to be placed in the vagina, may be less traumatic for

victims of rape, or women who have experienced sexual abuse or molestation. Additionally, many women prefer medication abortion because they can complete a medication abortion in the privacy of their homes, with the company of loved ones, and at a time of their choosing. For some women, their provider may offer only medication abortion.

70.    In 2000, the U.S. Food and Drug Administration approved the drug mifepristone for use as an abortion-inducing drug in the United States. As part of that approval, as with all medications, the FDA approved a Final Printed Labeling ("FPL"), which is an informational document that provides physicians with guidance about the use for which the drug sponsor requested and received FDA approval. Based on the clinical trials submitted in support of the application for approval, the manufacturer proposed, and the FDA approved, an FPL for mifepristone that reflects the regimen used in those trials, in which the patient takes 600 mg of mifepristone orally, returns to the health center approximately 36 to 48 hours later to take 400 µg of misoprostol orally, and then returns approximately 14 days later for a follow-up visit. Those trials found that regimen to be safe and effective through 49 days LMP, and the FPL, therefore, reflects that gestational age limit.

71.    Mifepristone is the only medication that has received FDA approval for marketing as an abortion-inducing drug, and therefore, the only medication with an FPL describing an abortion regimen.

72.    It is standard medical practice for physicians to prescribe FDA-approved drugs in dosages and for indications that were not specifically approved or contemplated by the FDA, particularly when supported by adequate study. The FDA has repeatedly acknowledged that use of such evidence-based regimens that vary from an FPL is common and is sometimes required by good medical practice.

73.   The FDA has never required that prescribers of mifepristone follow any particular regimen and has never imposed a gestational age limit on its use.

74.   By the time that mifepristone was approved in 2000, newer research showed that a lower dose of mifepristone (200 mg instead of 600 mg) combined with a different dose and route of self-administered misoprostol was an equally safe regimen and was effective through at least 63 days LMP. This research also showed that varying the route of misoprostol administration decreased side effects. Based on this research, from the time that mifepristone was approved, the overwhelming majority of abortion providers in the United States offered their patients a regimen different from the one on the FPL through at least 63 days LMP.

75.   Today, the regimen most commonly used across the country, including in Texas, involves 200 mg of mifepristone taken orally at the health center followed approximately 24 to 48 hours later by 800 µg of misoprostol which the woman self-administers at home buccally (between her cheek and gum).

76.   More than one million American women have now safely used an alternative evidence-based mifepristone regimen to terminate their pregnancies. ACOG, the World Health Organization, and the Royal College of Obstetricians and Gynecologists have all endorsed use of an alternative regimen through 63 days LMP. Medication abortion is also increasingly prevalent, chosen by more women each year.

77.   The evidence-based regimens used by Plaintiffs have been shown to be more effective than the FPL regimen, both having a lower rate of ongoing pregnancies and requiring fewer surgical interventions to complete the procedure. The alternative regimens have a number of other advantages. *First*, they are effective for longer in pregnancy, allowing medication abortions to be performed through at least 63 days LMP, which in turn allows many more

women to avail themselves of that method. Those additional weeks are significant because many women do not detect their pregnancies until close to 49 days LMP. *Second*, self-administration of misoprostol eliminates a trip to the health center, allows the woman greater control over the timing of the procedure, and ensures that she experiences the bleeding and cramping that follows in a location of her choosing. *Third*, the lower mifepristone dosage reduces the cost of the procedure significantly. *Fourth*, the alternative regimens have lower incidence of side effects than the regimen that appears on the FPL.

78.   The Act allows physicians to follow the regimen set forth in the FPL, but this regimen is outdated and it denies women the benefit of advances in the science of medication abortion that began even prior to the approval of mifepristone by the FDA, and that are described above. Specifically, because the FPL regimen is limited to 49 days LMP, the Act imposes a complete ban on medication abortion after that point, with no exceptions. In addition, under the FPL, women must return to the facility to take the misoprostol, rather than taking it at a location of their choosing one to two days later. Under the FPL, women must take 600 mg of mifepristone, rather than the 200 mg taken under evidence-based protocols. And, under the FPL, women are directed to ingest 400 µg of misoprostol orally, whereas the evidence-based protocols have women take 800 µg buccally or vaginally.

79.   The Act is even more restrictive than the FPL because it requires that any "abortion-inducing drug," as defined in the Act, be given by a physician. *See* Act at sec. 3 (*to be codified at* Tex. Health & Safety Code §§ 171.061(2), 171.063(a)(1)). The FDA has required only that mifepristone be provided under the supervision of the physician and has placed no restrictions on misoprostol. In addition, the Act requires "[t]he physician who gives, sells, dispense, administers, provides, or prescribes the abortion-inducing drug" to do certain things at the

follow-up visit, which must be "not more than 14 days after administration or use of the drug". *Id.* § 171.063(3). The FPL discusses a follow-up visit, but it does not require that a physician be involved at all.

80.    In addition to the FPL regimen, the medication abortion restrictions allow physicians to provide "an abortion-inducing drug in the dosage amount prescribed by the clinic management guidelines defined by the American Congress of Obstetricians and Gynecologists Practice Bulletin as those guidelines existed on January 1, 2013." *See* Act at sec. 3. However, this provision does not provide adequate guidance as to how to comply with the Act.

81.    ACOG's Practice Bulletin of Clinical Management Guidelines related to Medical Management of Abortion does not "prescribe" any specific "dosage amount," but does state among its highest level of recommendations that: "Compared with the FDA-approved regimen, mifepristone-misoprostol regimens using 200 mg of mifepristone orally and 800 µg of misoprostol vaginally are associated with a decreased rate of continuing pregnancies, decreased time to expulsion, fewer side effects, improved complete abortion rates, and lower cost for women with pregnancies up to 63 days of gestation based on LMP." It further states that: "A patient can administer misoprostol safely and effectively, orally or vaginally, in her home as part of a medical abortion regimen."

82.    The ACOG recommendation is not limited to a "dosage amount," but rather describes a regimen that uses a different route of administration for the misoprostol than the FPL, as well as a different gestational age limit. The language of the Act does not reflect the content of the ACOG Guideline, and as a result, it is not clear which parts of the Guideline a physician can rely on to deviate from the FPL.

83.    The Act's ban on medication abortion after 49 days LMP will be particularly dangerous for some women with certain medical conditions who face a greater risk of both complications and failure from a surgical abortion rather than a medication abortion. These women include those who have an anomaly of the reproductive and genital tract, such as large uterine fibroids or cervical stenosis, which makes accessing the pregnancy inside the uterus as part of a surgical abortion difficult or impossible. The Act makes no exception for women with these medical conditions.

84.    In addition to prohibiting all medication abortion after 49 days, the Act will make it difficult or impossible for many women seeking medication abortions through 49 days to do so. That is because, under the Act, in order to have a medication abortion, a woman will be required to make four separate trips to an abortion facility over the course of two weeks. Texas law prior to enactment of the Act required that unless she lives more than 100 miles from any abortion provider, the "physician who is to perform the abortion" provide certain information to the woman in person at least 24 hours before the procedure (visit 1). Tex. Health & Safety Code § 171.012. The woman must return at least 24 hours later to take the mifepristone (visit 2) and then two days after that to take the misoprostol (visit 3). Additionally, the Act requires "[t]he physician who gives, sells, dispenses, administers, provides, or prescribes the abortion-inducing drug" to see the woman during a follow-up visit which must be "not more than 14 days after administration or use of the drug" (visit 4). Act sec. 3 (*to be codified at* Tex. Health & Safety Code § 171.063(e)).

85.    The Act will increase the required number of visits to an abortion provider, because Texas women who currently choose medication abortion and live within 100 miles of an abortion facility either make three visits (for the mandatory counseling, to take the mifepristone, and for a

follow-up), or only two visits if they have their follow-up at a different location. And if they live more than 100 miles from an abortion provider, they can have a medication abortion with one visit, which under the Act, would become three. Each trip to a facility will require additional travel and time away from home, children, and work, which will be particularly difficult for low-income women, women who live in rural areas, and women who are victims of abuse.

86.    The Act will deprive women of the benefits of the newer regimens, and greatly increase both the cost and the burden of a medication abortion. The increased burden and cost will come with no medical benefit and indeed, with some medical harm.

87.    Due to the limited availability of physicians who perform abortions in Texas, physicians often provide abortion services at more than one location. In such cases, a physician may be available at a particular abortion facility for only one or two days a week. It will be difficult, and in some cases impossible, to ensure that at these locations the same physician is available for each of the required visits for a medication abortion.

88.    Some Texas abortion facilities currently offer only medication abortion. If the Act's restrictions take effect, many of these facilities will cease providing abortions altogether and women who would have gone to those facilities will have to travel elsewhere. Other facilities that offer both surgical and medication abortion will be unable to offer medication abortion due to the onerous requirements Texas has placed on women and providers.

## CLAIMS FOR RELIEF

### COUNT I
**(Patients' Substantive Due Process/Admitting Privileges and Medication Abortion)**

89.    The allegations of paragraphs 1 through 88 are incorporated as though fully set forth herein.

90.     The challenged provisions of Texas House Bill No. 2—the admitting privileges requirement and the medication abortion restrictions—violate Plaintiffs' patients' right to liberty and privacy as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, standing alone, together, and in conjunction with burdens imposed by existing Texas law, because they are medically unwarranted health regulations and they impose an undue burden on women seeking abortions.

91.     In order to protect the constitutional rights of their patients, Plaintiffs file this suit against Defendants for declaratory judgment and for preliminary and permanent injunctive relief pursuant to 42 U.S.C. § 1983.

## COUNT II
### (Vagueness/Admitting Privileges)

92.     The allegations of paragraphs 1 through 91 are incorporated as though fully set forth herein.

93.     The admitting privileges requirement of Texas House Bill No. 2 violates the rights of Plaintiffs under the Due Process Clause of the Fourteenth Amendment to the United States Constitution because in not defining the meaning of "active admitting privileges," it fails to give Plaintiffs fair notice of the requirements of the Act and leaves them subject to arbitrary and discriminatory enforcement.

94.     In order to protect their constitutional rights and those of their physicians and patients, Plaintiffs file this suit against Defendants for declaratory judgment and for preliminary and permanent injunctive relief pursuant to 42 U.S.C. § 1983.

## COUNT III
### (Procedural Due Process/Admitting Privileges)

95.    The allegations of paragraphs 1 through 94 are incorporated as though fully set forth herein.

96.    The admitting privileges requirement of Texas House Bill No. 2 violates the right to procedural due process guaranteed to Plaintiffs and their physicians by the Fourteenth Amendment to the United States Constitution because it deprives physicians of a constitutionally adequate opportunity to attempt to comply.

97.    In order to protect their constitutional rights and those of their physicians and patients, Plaintiffs file this suit against Defendants for declaratory judgment and for preliminary and permanent injunctive relief pursuant to 42 U.S.C. § 1983.

## COUNT IV
### (Substantive Due Process – Unlawful Delegation/Admitting Privileges)

98.    The allegations of paragraphs 1 through 97 are incorporated as though fully set forth herein.

99.    The admitting privileges requirement of Texas House Bill No. 2 violates rights secured to Plaintiffs, their physicians, and patients, under the Fourteenth Amendment to the United States Constitution. The admitting privileges requirement makes Plaintiffs' physicians' ability to perform abortions contingent on obtaining privileges at local hospitals, and thereby unconstitutionally allows a private entity to set criteria that physicians must meet in order to provide an abortion.

100.    In order to protect their constitutional rights and those of their physicians and patients, Plaintiffs file this suit against Defendants for declaratory judgment and for both preliminary and permanent injunctive relief pursuant to 42 U.S.C. § 1983.

## COUNT V
### (Vagueness/Medication Abortion)

101.    The allegations of paragraphs 1 through 100 are incorporated as though fully set forth herein.

102.    The medication abortion restrictions of Texas House Bill No. 2 violate the rights of Plaintiffs under the Due Process Clause of the Fourteenth Amendment to the United States Constitution because the Act's reference to "the dosage amount prescribed by the clinic management guidelines defined by the American Congress of Obstetricians and Gynecologists Practice Bulletin as those guidelines existed on January 1, 2013," fails to give Plaintiffs fair notice of the requirements of the Act and subjects them to arbitrary and discriminatory enforcement.

103.    In order to protect their constitutional rights and those of their physicians and patients, Plaintiffs file this suit against Defendants for declaratory judgment and for both preliminary and permanent injunctive relief pursuant to 42 U.S.C. § 1983.

### REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court:

A.    Issue a declaratory judgment that the admitting privileges requirement and the medication abortion restrictions of Texas House Bill No. 2 are unconstitutional and unenforceable;

B.    Issue preliminary and permanent injunctive relief restraining Defendants, and their employees, agents, and successors in office from enforcing the admitting privileges requirement and the medication abortion restrictions of Texas House Bill No. 2;

C.  Grant Plaintiffs attorneys' fees, costs and expenses pursuant to 42 U.S.C. § 1988; and/or

D.  Grant such other and further relief as this Court may deem just, proper, and equitable.


Dated: September 27, 2013


Respectfully submitted,

 */s/R. James George, Jr.*

| | |
|---|---|
| R. James George, Jr. | Janet Crepps* |
| Texas State Bar No. 07810000 | Esha Bhandari* |
| Elizabeth von Kreisler | Jennifer Sokoler* |
| Texas State Bar No. 24047273 | Center for Reproductive Rights |
| Rico Reyes | 120 Wall Street, 14th Floor |
| Texas State Bar No. 24032999 | New York, NY 10005 |
| George Brothers Kincaid & Horton LLP | (864) 962-8519 (Janet Crepps) |
| 1100 Norwood Tower | (917) 637-3600 (Bhandari & Sokoler) |
| 114 West 7th Street | jcrepps@reprorights.org |
| Austin, TX 78701 | ebhandari@reprorights.org |
| (512) 495-1400 | jsokoler@reprorights.org |
| (512) 499-0094 | |
| jgeorge@gbkh.com | *Attorneys for Plaintiffs Whole Woman's* |
| evonkreisler@gbkh.com | *Health, Austin Women's Health Center,* |
| rreyes@gbkh.com | *Killeen Women's Health Center, Southwestern* |
| | *Women's Surgery Center, West Side Clinic,* |
| *Attorneys for all Plaintiffs* | *Inc., Alan Braid, M.D., Lamar Robinson, M.D.,* |
| | *and Pamela J. Richter, D.O.* |
| | |
| Helene T. Krasnoff* | Brigitte Amiri* |
| Alice Clapman* | Renée Paradis* |
| Planned Parenthood Federation of America | American Civil Liberties Union Foundation |
| 1110 Vermont Avenue, N.W., Suite 300 | Reproductive Freedom Project |
| Washington, D.C. 20005 | 125 Broad Street, 18th Floor |
| (202) 973-4800 | New York, NY 10004 |
| helene.krasnoff@ppfa.org | (212) 519-7897 |
| alice.clapman@ppfa.org | bamiri@aclu.org |
| | rparadis@aclu.org |
| *Attorneys for Planned Parenthood* | |
| *Plaintiffs* | Rebecca L. Robertson** |
| | Texas Bar No. 00794542 |

American Civil Liberties Union of Texas
1500 McGowen Street, Suite 250
Houston, TX 77004
(713) 942-8146
rrobertson@aclutx.org

*Attorneys for Plaintiffs Routh Street Women's
Clinic, Houston Women's Clinic, and
Southwestern Women's Surgery Center*

*Application for admission *pro hac vice* forthcoming

**Application for admission to the Western District of Texas pending