UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| PLANNED PARENTHOOD OF GREATER TEXAS SURGICAL HEALTH SERVICES, PLANNED PARENTHOOD CENTER FOR CHOICE, PLANNED PARENTHOOD SEXUAL HEALTHCARE SERVICES, PLANNED PARENTHOOD WOMEN'S HEALTH CENTER, WHOLE WOMAN'S HEALTH, AUSTIN WOMEN'S HEALTH CENTER, KILLEEN WOMEN'S HEALTH CENTER, SOUTHWESTERN WOMEN'S SURGERY CENTER, WEST SIDE CLINIC, INC., ROUTH STREET WOMEN'S CLINIC, HOUSTON WOMEN'S CLINIC, each on behalf of itself, its patients and physicians, ALAN BRAID, M.D., LAMAR ROBINSON, M.D., PAMELA J. RICHTER, D.O., each on behalf of themselves and their patients; Plaintiffs, | § § § § § § § § § § § § § § § § | CIVIL ACTION NO. 1:13-cv-862 |
| v. | § § | |
| GREGORY ABBOTT, Attorney General of Texas; DAVID LAKEY, M.D., Commissioner of the Texas Department of State Health Services; MARI ROBINSON, Executive Director of the Texas Medical Board; DAVID ESCAMILLA, County Attorney for Travis County; CRAIG WATKINS, Criminal District Attorney for Dallas County; DEVON ANDERSON, District Attorney for Harris County; MATTHEW POWELL, Director of the Lubbock County Criminal District Attorney's Office; JAMES E. NICHOLS, County Attorney for Bell County; JOE SHANNON, JR., Criminal District Attorney for Tarrant County; RENE GUERRA, Criminal District Attorney for Hidalgo County; SUSAN D. REED, Criminal District Attorney for Bexar County; ABELINO REYNA, Criminal District Attorney for McLennan County; JAIME ESPARZA, District Attorney for El Paso County; each in their official capacities, as well as their employees, agents, Defendants. | § § § § § § § § § § § § § § § § § § § § § | |

## STATE DEFENDANTS' TRIAL BRIEF

# TABLE OF CONTENTS

I.   The Plaintiffs Lack Standing To Assert Third-Party Rights. ...........................................1

    A.   Abortion Providers Have No Standing To Assert The Rights Of Their Patients When Challenging Health And Safety Regulations...................1

        1.   The Plaintiffs Fail To Allege or Demonstrate That Women Will Encounter "Hindrances" To Suing To Advance Their Own Rights. .........................................................................................1

        2.   The Plaintiffs Fail To Allege or Demonstrate a "Close Relation" With Abortion Patients.............................................3

        3.   Justice Blackmun's Plurality Opinion in *Singleton v. Wulff* And the Vacated Panel Opinion in *Okpalobi v. Foster* Are Not Persuasive And Should Not Be Followed. ..........................4

        4.   Allowing Abortion Providers To Assert The Rights Of Women Will Overrule *Roe v. Wade*'s Holding That Jane Roe's Claims Were Not Moot. ...........................................................8

    B.   The Abortion Clinics Lack Standing To Assert The Rights Of Their Physicians. ...............................................................................9

II.  The Plaintiffs Cannot Assert Third-Party Rights Under Either 42 U.S.C. § 1983 or the Declaratory Judgment Act. .......................................10

III. The Plaintiffs Ignore HB 2's Severability Provisions By Asserting Third-Party Rights And Demanding Relief On Behalf Of All Their Patients And Physicians.................................................................................13

IV.  The State Defendants Are Entitled to Judgment As a Matter of Law on the Plaintiffs' Constitutional Claims. ....................................................16

    A.   Supreme Court Decisions Restricting The States' Prerogative To Regulate Abortion Must Be Construed Narrowly............................16

    B.   The Plaintiffs' Constitutional Challenges To HB 2's Hospital-Admitting Privileges Requirement Must Be Rejected. .....................17

        1.   The Plaintiffs' "Undue Burden" Challenges To HB 2's Hospital-Admitting Privileges Requirement Must Be Rejected.........................................................................................17

            a.   The Plaintiffs Cannot Succeed On A Facial Challenge To HB 2's Hospital-Admitting Privileges

Requirement, Because They Do Not Allege Or Attempt To Prove That It Will Impose An "Undue Burden" On Every Patient Who Seeks An Abortion In Texas......................................................................................19

b.     Whatever Burdens May Be Imposed By A Hospital-Admitting Privileges Requirement Are *Per Se* Lawful Under *Casey* and *Mazurek*..............................................21

i.     Abortion regulations that impose increased travel burdens do not represent an "undue burden."........................................................21

ii.     Laws establishing qualifications for persons performing abortions do not represent an "undue burden."........................................................23

c.     The Plaintiffs Have Failed To Provide Sufficient Evidence That HB 2's Admitting-Privileges Requirement Would Impose "Undue Burdens" on Patients, And the Plaintiffs Cannot Prove Their Case Until the Law Takes Effect. ...............................26

i.     The plaintiffs have failed to prove, by a preponderance of the evidence, that HB 2's hospital-admitting privileges requirement provides no health or safety benefits. ................29

ii.     The plaintiffs have failed to prove, by a preponderance of the evidence, that HB 2's hospital-admitting privileges requirement imposes a "substantial obstacle" on all abortion patients in Texas.................................31

d.     The District-Court Decisions Cited By the Plaintiffs Offer No Support For Enjoining HB 2's Hospital-Admitting Privileges Requirement. ...............35

2.     The Plaintiffs' Vagueness Challenges To HB 2's Hospital-Admitting Privileges Requirement Must Be Rejected.......................36

3.     The Plaintiffs' Procedural Due Process Challenges To HB 2's Hospital-Admitting Privileges Requirement Must Be Rejected......................................37

4.      The Plaintiffs' "Unlawful Delegation" Challenge To HB 2's Hospital-Admitting Privileges Requirement Must Be Rejected...........................................................................................38

C.      The Restrictions On Mifepristone Abortions Are Constitutional...................38

1.      *Mazurek v. Armstrong* and *Gonzales v. Carhart* Foreclose The Plaintiffs' Under-Burden Challenge.......................................................38

2.      The Plaintiffs Have Failed to Prove By A Preponderance Of The Evidence That HB 2's Regulations Of Mifepristone Abortions Impose An Undue Burden.....................................................40

3.      *DeWine*'s Analysis Is More Persuasive Than *Cline* and *Burdick*..........43

4.      The Plaintiffs Vagueness Challenges to HB 2's Regulations Of Mifepristone Abortions Are Meritless. ............................................45

V.      Attorney General Abbott Is Not a Proper Defendant and Should Be Dismissed...........................................................................................................46

Conclusion .......................................................................................................................47

Certificate of Service.......................................................................................................48

# I.   THE PLAINTIFFS LACK STANDING TO ASSERT THIRD-PARTY RIGHTS.

Each of the plaintiffs is asserting constitutional rights that belong to others.  The plaintiff physicians are asserting the rights of their patients, and the plaintiff abortion clinics are asserting the rights of their patients as well as their physician-employees.  The plaintiffs lack standing to assert these third-party rights.

A litigant "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  *Kowalski v. Tesmar*, 543 U.S. 125, 129 (2004) (citation omitted).  Litigants may assert the rights of third parties only when:  (1) the litigant has "a close relation[ ]" to the third party; and (2) there is some "hindrance" to the third party's ability to protect his or her own interests.  *See id.* at 130.  In addition, the litigant's complaint must clearly allege facts demonstrating that these criteria for third-party standing are met.  *See Warth v. Seldin*, 422 U.S. 490, 518 (1975) ("It is the responsibility of the complainant *clearly to allege facts demonstrating* that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers.") (emphasis added).  The plaintiffs have failed to allege facts demonstrating their standing to assert third-party rights, as required by *Warth*, and in all events they cannot show that third-party standing is proper.

## A.   Abortion Providers Have No Standing To Assert The Rights Of Their Patients When Challenging Health And Safety Regulations.

Each of the plaintiffs in this case purports to challenge HB 2 on behalf of women, but none of them satisfies the requirements for third-party standing.

### 1.   The Plaintiffs Fail To Allege or Demonstrate That Women Will Encounter "Hindrances" To Suing To Advance Their Own Rights.

A plaintiff cannot invoke the constitutional rights of third parties unless he clearly alleges and demonstrates that the third-party rights-holders face a "hindrance" to protecting their own rights.  *See Kowalski*, 543 U.S. at 130; *Warth*, 422 U.S. at 518.  The plaintiffs' complaint does not even

allege that women face a "hindrance" to suing on their behalf. That alone warrants dismissal under *Warth*. *See* 422 U.S. at 518.

The plaintiffs also cannot demonstrate that "some hindrance" affects their patients' ability to sue. Any pregnant woman who wants to use mifepristone for non-FDA approved uses, or who wants an abortion from a physician who lacks hospital-admitting privileges, can sue the officials charged with enforcing HB 2, and any such woman in Texas could provide a suitable plaintiff. *Roe v. Wade* proves this point. When a pregnant woman challenged a Texas statute that criminalized elective abortions, the courts allowed her to proceed pseudonymously to protect her privacy, and further held that the end of the woman's pregnancy would not moot her case. *See Roe*, 410 U.S. 113, 124–25 (1973). *Roe* empowers a woman to challenge any statute regulating abortion—without compromising her privacy and without encountering any mootness barriers.

Countless numbers of post-*Roe* abortion cases have been brought by women asserting their own rights.[1] That precludes a finding of "hindrance." *Kowalski*, 543 U.S. at 132 (holding that a documented history of lawsuits brought by third-party rights-holders defeats a claim of "hindrance" made by first-party litigants). *Diamond v. Charles* provides that abortion providers may sue on behalf of women only when the rights-holders are "*unable* to assert" their rights—not when it would be merely inconvenient for them to do so. 476 U.S. 54, 65–66 (1986) (emphasis added). And Fifth Circuit precedent allows third-party standing only when the rights-holder "*cannot assert* its own rights" or "*is disabled from pressing* its rights." *McCormack v. Nat'l Collegiate Athletic Ass'n*, 845 F.2d

---

[1] *See, e.g.*, *Williams v. Zbaraz*, 448 U.S. 358 (1980) (Jane Doe, an indigent pregnant woman); *Poelker v. Doe*, 432 U.S. 519 (1977) (same); *Roe v. Crawford*, 514 F.3d 789 (8th Cir. 2008) (suit by pregnant inmates seeking to obtain transportation for off-site abortions); *Doe v. United States*, 372 F.3d 1308 (Fed. Cir. 2004), *sub nom.* 419 F.3d 1058 (9th Cir. 2005) (pregnant wife of armed services member sought abortion funding); *Coe v. Melahn*, 958 F.2d 223 (8th Cir. 1992) (Coe, who had undergone an abortion, challenged a statute regulating insurance coverage for elective abortions); *Rodos v. Michaelson*, 527 F.2d 582 (1st Cir. 1975) (pregnant woman brought suit challenging the constitutionality of an abortion statute).

1338, 1341 (5th Cir. 1988) (emphasis added). The plaintiffs cannot plausibly claim that their patients "cannot assert," are "unable to assert," or are "disabled from pressing" their claims against the provisions of HB 2. Finally, *Kowalski* holds that a documented history of lawsuits brought by third-party rights-holders defeats a claim of "hindrance" made by first-party litigants. *See* 543 U.S. at 132.

##### 2. The Plaintiffs Fail To Allege or Demonstrate a "Close Relation" With Abortion Patients.

Even if the plaintiffs could demonstrate that some "hindrance" prevents abortion patients from challenging HB 2, the plaintiff abortion providers would *still* lack standing to assert the rights of their patients. The plaintiffs must also allege and demonstrate a "close relation" with the third-party rights-holders. *See Kowalski*, 543 U.S. at 130; *Warth*, 422 U.S. at 518. Once again, the plaintiffs' complaint does not allege anything regarding this criterion for third-party standing, seemingly unaware of its obligation under *Warth* to "clearly allege facts demonstrating" that the plaintiff abortion providers are "a proper party to invoke judicial resolution of the dispute." 422 U.S. at 518.

The plaintiffs also cannot demonstrate a "close relation" with abortion patients because they are challenging regulations that protect the health and safety of those patients. This presents an irreconcilable conflict of interest between the providers and consumers of abortion. Third-party standing is forbidden if the interests of the litigant and the third-party rights-holder are even "potentially in conflict." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 15 (2004); s*ee also Kowalski*, 543 U.S. at 135 (Thomas, J., concurring) (noting that third-party standing is disallowed when the litigants "may have very different interests from the individuals whose rights they are raising"). When the state regulates abortion with an aim toward protecting the pregnant woman's health, or ensuring that the woman has sufficient information before deciding whether to abort, the interests of providers and consumers diverge. Abortion providers will understandably oppose any law that limits their freedom to practice their trade. But an abortion provider cannot claim to act on behalf

of one of its patients when it sues to invalidate a law designed to protect her at the provider's expense. To hold otherwise would be akin to allowing merchants to challenge consumer-protection laws by invoking the constitutional rights of their customers, or allowing employers to challenge workplace-safety laws by invoking the constitutional rights of their employees.

Standing doctrine must also give abortion patients autonomy to decide whether to invoke their constitutional rights against a law that was enacted for their benefit and protection. *See Duke Power Co v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 80 (1978) (noting that one "reason[] for th[e] prudential limitation on standing when rights of third parties are implicated" is "the avoidance of the adjudication of rights which those not before the Court may not wish to assert"). Abortion patients may decide that the assurance of knowing that their abortion will be performed by a doctor with hospital-admitting privileges, or that their doctor will prescribe abortion pills only for FDA-approved uses, is worth more to them than the constitutional rights that they could assert against HB 2. *See* Johnson Decl. Criminal defendants, for example, have a constitutional right to a jury trial, yet they often waive that constitutional right in exchange for some nonconstitutional entitlement that they value more—such as a promise of reduced charges of a lighter sentence. *See generally* Frank H. Easterbrook, *Criminal Procedure as a Market System*, 12 J. LEGAL STUD. 289 (1983).

### 3. Justice Blackmun's Plurality Opinion in *Singleton v. Wulff* And the Vacated Panel Opinion in *Okpalobi v. Foster* Are Not Persuasive And Should Not Be Followed.

In *Singleton v. Wulff*, 428 U.S. 106 (1976), a four-justice plurality opined that "it generally is appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision." *Id.* at 118 (opinion of Blackmun, J.). Some judges have mistakenly cited *Singleton* as establishing a general prerogative for physicians to assert the rights of abortion patients. *See, e.g.*, *Okpalobi v. Foster*, 190 F.3d 337, 350–53 (5th Cir. 1999), *vacated and rev'd*, *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) (en banc). But the *Singleton* plurality opinion is not

law. It received only four votes, and Justice Stevens's concurrence pointedly declined to join Justice Blackmun's analysis of third-party standing. 428 U.S. at 121–22 (Stevens, J., concurring in part).

The Supreme Court has never ratified Justice Blackmun's plurality opinion in *Singleton*, nor has it endorsed his analysis of third-party standing. Some post-*Singleton* Supreme Court rulings have adjudicated constitutional claims brought by abortion-performing doctors on behalf of abortion patients without discussing third-party standing. *See, e.g., Stenberg v. Carhart*, 530 U.S. 914 (2000); *Mazurek v. Armstrong*, 520 U.S. 968 (1997) (per curiam); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992). But the defendants in those cases did not brief or argue standing in the Supreme Court, and issues that the Supreme Court assumes without discussion, and without challenge from the litigants, do not establish precedential holdings. *See, e.g., Lewis v. Casey*, 518 U.S. 343, 352 n.2 (holding that when "standing was neither challenged nor discussed" in an earlier case, that case "has no precedential effect" on the issue of standing); *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37–38 (1952) (holding that if an issue "was not there raised in briefs or argument nor discussed in the opinion of the Court," then "the case is not a binding precedent").[2]

Justice Blackmun's plurality opinion in *Singleton* should not be followed because it is not persuasive. Consider the opinion's claim that an abortion patient faces "several obstacles" to asserting her constitutional rights in litigation:

> For one thing, she may be chilled from such assertion by a desire to protect the very privacy of her decision from the publicity of a court suit. A second obstacle is the imminent

---

[2] Although the Supreme Court's ruling in *Doe v. Bolton* is sometimes cited as a case that allows physicians to assert the rights of patients, the opinion in *Doe* says nothing whatsoever about third-party standing. *Doe* held only that the doctors' "standing" allows them to bring pre-enforcement challenges to criminal abortion laws without having to wait for prosecution. *See Doe*, 410 U.S. 179, 188-189 (1973). There was no need to resolve whether abortion-performing physicians could assert the rights of their customers, as opposed to their own rights, because Mary Doe had already been found to have standing to assert the rights of abortion-seeking women. *See id.* at 189 ("[W]e conclude that we need not pass upon the [standing] of these additional appellants in this suit, for the issues are sufficiently and adequately presented by Doe and the physician-appellants.").

mootness, at least in the technical sense, of any individual woman's claim. Only a few months, at the most, after the maturing of the decision to undergo an abortion, her right thereto will have been irrevocably lost, assuming, as it seems fair to assume, that unless the impecunious woman can establish Medicaid eligibility she must forgo abortion.

*Singleton*, 428 U.S. at 117. Each of these supposed "obstacles" is chimerical. *Roe v. Wade* established

that any abortion patient may sue using a pseudonym, and further holds that *all* "pregnancy

litigation" will avoid mootness under the "capable of repetition yet evading review" doctrine.

Although the Blackmun plurality opinion acknowledges these facts, it fails explain how any abortion

patient can claim that she faces a "hindrance" to bringing a lawsuit:

> It is true that these obstacles are not insurmountable. Suit may be brought under a pseudonym, as so frequently has been done. A woman who is no longer pregnant may nonetheless retain the right to litigate the point because it is " 'capable of repetition yet evading review.'" *Roe v. Wade*, 410 U.S. at 124–125, 93 S. Ct. at 713. And it may be that a class could be assembled, whose fluid membership always included some women with live claims. *But if the assertion of the right is to be "representative" to such an extent anyway, there seems little loss in terms of effective advocacy from allowing its assertion by a physician.*

*Singleton*, 428 U.S. at 117–18 (emphasis added). This discussion is simply inadequate. First, the

plurality opinion allows only that its earlier-stated privacy and mootness concerns present no

"insurmountable" obstacle—when in fact the mootness doctrine presents no obstacle *at all*, and the

privacy concerns are *completely* alleviated by the protection of pseudonymous litigation. Second, the

opinion fails to explain how a patient can face a "hindrance" to suing on her own behalf given the

accommodations that the Court established in *Roe*. Instead, the italicized language changes the

subject to the "close relation" prong of the third-party standing test, arguing that physicians can

advocate for their patients' rights as effectively as a class representative. But whether the physician

can effectively advocate the rights of his patients has nothing to do with whether the patients will

encounter a "hindrance" to advancing their own rights. Finally, *Roe* does not require that pregnant

women bring their lawsuits as class actions to avoid the mootness barrier; the "capable of repetition

yet evading review" doctrine enables even an individual pregnant women to challenge anti-abortion

laws without losing her claims on account of mootness at the conclusion of pregnancy. *See Roe*, 410

U.S. at 125; *see also* Stephen J. Wallace, *Why Third-Party Standing in Abortion Suits Deserves a Closer Look*, 84 NOTRE DAME L. REV. 1369, 1397 (2009) (noting that the Blackmun plurality opinion in *Singleton* was "unable to articulate a hindrance or obstacle for which the Court itself had not already provided a solution"). It is hardly surprising that Justice Stevens refused to join this discussion, depriving it of the fifth vote necessary to make it law.

The vacated panel opinion in *Okpalobi v. Foster*, 190 F.3d 337 (5th Cir. 1999), also is not persuasive and should not be followed, because it mischaracterizes the Supreme Court's pronouncements in *Singleton*, 428 U.S. 106, and *Casey*, 505 U.S. 833.[3] First, it quoted from the *plurality* opinion in *Singleton*—an opinion that received only four votes, not five—and proceeded as if a Supreme Court *majority* had declared that "[i]t generally is appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision." *See* 190 F.3d at 351 (quoting *Singleton*, 428 U.S. at 118 (opinion of Blackmun, J.)). Second, the *Okpalobi* panel opinion cited *Casey* and described it as a case that "allow[ed] abortion providers to challenge a state statute on behalf of third party women who seek abortion services." *See id.* (citing *Casey*, 505 U.S. at 845). But *Casey* never discussed third-party standing, and the parties did not contest *any* issues of standing in their briefs. *See* Brief for Petitioners, 1992 WL 551419, *Casey*, 505 U.S. 833, Nos. 91-744 & 91-902 (1992); Brief for Respondents, 1992 WL 551421, at *48 n.19, *Casey*, 505 U.S. 833, Nos. 91-744 & 91-902 (1992). *Casey* therefore does not establish any holding on third-party standing. 505 U.S. at 845. The vacated panel opinion in *Okpalobi* also makes no effort to explain how abortion patients encounter "hindrances" or "obstacles" to asserting their rights in court.

---

[3] The *Okpalobi* panel opinion was automatically vacated when the Fifth Circuit granted en banc rehearing. *See Okpalobi v. Foster*, 201 F.3d 353 (5th Cir. 2000) (granting en banc rehearing); 5th Cir. R. 41.3. When a court decision is vacated, "its ruling and guidance" are "erased." *See United States v. Windsor*, 133 S. Ct. 2675, 2688 (2013); *United States ex rel. Marcy v. Rowan Cos.*, 520 F.3d 384, 389 (5th Cir. 2008) ("[T]he *Southland* panel opinion upon which Marcy relies was automatically vacated when it was reheard en banc. Accordingly, the 2002 *Southland* panel opinion is not precedent." (internal citations omitted)).

4. **Allowing Abortion Providers To Assert The Rights Of Women Will Overrule *Roe v. Wade*'s Holding That Jane Roe's Claims Were Not Moot.**

Even if this court were persuaded by the analysis in the *Singleton* plurality opinion or the vacated *Okpalobi* panel opinion, it could not adopt either of those opinions without overruling *Roe v. Wade*'s mootness analysis. *Roe* holds that a pregnant woman's legal challenge to an anti-abortion law cannot become moot at the end of pregnancy because her claims are "capable of repetition, *yet evading review*." 410 U.S. at 125 (emphasis added). But if abortion providers can sue to enforce the constitutional rights of their present and future patients at any time, as the *Singleton* plurality opinion claims, then legal challenges brought by pregnant women will never "evad[e] review" if dismissed as moot. Under the *Singleton* plurality opinion, a mootness dismissal will mean only that courts will review the pregnant woman's claims in lawsuits brought by abortion providers rather than pregnant women. It follows that Jane Roe's constitutional challenge would not "evade review" if dismissed at the conclusion of her pregnancy, and that *Roe v. Wade*'s mootness holding is no longer good law.

A claim does not "evade review" when someone else remains capable of litigating the claim to its conclusion. *See DeFunis v. Odegaard*, 416 U.S. 312, 318–19 (1974); Richard A. Epstein, *Substantive Due Process by Any Other Name: The Abortion Cases*, 1973 SUP. CT. REV. 159, 163. If abortion providers have standing not only to assert their patients' rights, but to assert those rights in pre-enforcement challenges without waiting for criminal prosecution, then constitutional challenges to abortion laws can always be "fully litigated"—by the abortion providers. That means pregnant women will no longer be able to invoke the "capable of repetition, yet evading review" doctrine because their claims no longer evade review.

The *Singleton* plurality opinion cuts the legs from under *Roe*'s holding on the capable-of-repetition-yet-evading-review issue. But a federal district court cannot follow a Supreme Court plurality opinion when its reasoning contradicts the holding of a Supreme Court majority opinion.

*See, e.g., Agostini v. Felton*, 521 U.S. 203, 238 (1997). This Court is obligated to follow the holding in *Roe v. Wade*—that Jane Roe's constitutional challenge to the Texas anti-abortion law did not become moot at the conclusion of her pregnancy. And that holding cannot co-exist with the *Singleton* plurality opinion, which allows abortion-providing physicians to assert *all* the constitutional claims of abortion patients in pre-enforcement challenges to abortion legislation.

**B.     The Abortion Clinics Lack Standing To Assert The Rights Of Their Physicians.**

The plaintiff abortion clinics are not challenging the provisions of HB 2 that require them to meet the standards of an ambulatory surgical center. Rather, they are challenging provisions that regulate only *physicians*. Thus, their claims for relief assert constitutional rights that belong either to their patients or their physicians. The proper plaintiffs for the vagueness, procedural due process and non-delegation challenges are the physicians, not the abortion clinics that employ them.

The abortion clinics cannot satisfy the requirements for third-party standing under *Kowalski* and *Warth*. Abortion-performing physicians face no hindrances to suing to vindicate their rights, and no hindrance is alleged in the complaint. It would be hard to reconcile such an allegation with the fact that the plaintiffs in this case include three abortion-performing doctors who have sued on their own behalf.

The plaintiff abortion clinics are attempting to engage in representative litigation without seeking class certification under Federal Rule of Civil Procedure 23. This is an improper attempt to evade Rule 23 and the Supreme Court's decisions limiting the use of representative litigation. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011); *see also M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832 (5th Cir. 2012). The individual physicians must bring their own claims, and if they want a representative to litigate on their behalf they must seek class certification and demonstrate that they

satisfy the requirements of Rule 23 and *Wal-Mart*. They cannot evade the requirements for class certification by having an abortion clinic sue on their behalf.

## II. THE PLAINTIFFS CANNOT ASSERT THIRD-PARTY RIGHTS UNDER EITHER 42 U.S.C. § 1983 OR THE DECLARATORY JUDGMENT ACT.

Even if the plaintiffs could somehow avoid these judicially imposed limits on third-party litigation, they *still* cannot assert third-party rights under 42 U.S.C. § 1983 or the Declaratory Judgment Act. Each of these statutes establishes a limited cause of action—one that extends only to litigants who assert their *own* rights. *See* 42 U.S.C. § 1983 (providing that every "person" who acts under color of state law and deprives another person of his constitutional or federal rights "shall be liable *to the party injured*") (emphasis added); 28 U.S.C. § 2201(a) (authorizing federal court to "declare the rights and other legal relations of *any interested party seeking such declaration . . .*") (emphasis added). The third-party claims therefore cannot proceed under either section 1983 or the Declaratory Judgment Act; the plaintiffs must rely on a different cause of action or else face the dismissal of these third-party claims for failing to state a claim on which relief can be granted.

The cause-of-action inquiry is distinct from the question of "standing." As the Supreme Court has explained, "*standing* is a question of whether a plaintiff is sufficiently adversary to a defendant to create an Art. III case or controversy, or at least to overcome prudential limitations on federal-court jurisdiction," while "*cause of action* is a question of whether a particular plaintiff is a member of the class of litigants that may, as a matter of law, appropriately invoke the power of the court." *Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979). Even plaintiffs who can surmount the Supreme Court's doctrinal restrictions on third-party standing must still point to a provision of law that authorizes them to sue. The plaintiffs' complaint invokes both 42 U.S.C. § 1983 and the Declaratory Judgment Act, but neither of those statutes provides a cause of action that allows plaintiffs to assert the rights of non-litigant third parties.

Section 1983 provides that when a person acting under color of state law deprives "any citizen of the United States or other person within the jurisdiction thereof" of constitutional rights, the state officer "shall be liable *to the party injured*." That section 1983 deploys a definite article ("*the* party injured," not "*a* party injured") indicates that its description of the permissible plaintiffs refers back to its earlier description of the "citizen" or "person" who has suffered the deprivation of his rights. In the words of Professor Currie, section 1983:

> plainly authorizes suit by anyone alleging that he has been deprived of rights under the Constitution or federal law, *and by no one else*. It thus incorporates, *but without exceptions*, the Court's "prudential" principle that the plaintiff may not assert the rights of third parties.

David P. Currie, *Misunderstanding Standing*, 1981 SUP. CT. REV. 41, 45 (emphasis added). Only the rights-holder may sue as a plaintiff under section 1983; the statutory language does not accommodate lawsuits brought by plaintiffs who seek to vindicate the constitutional rights of third parties.

*Rizzo v. Goode*, 423 U.S. 362 (1976), recognizes that liability under section 1983 can attach only to conduct that violates *the complainant's* federally protected rights—and not the rights of non-litigant third parties. The *Rizzo* Court explained that "[t]he plain words of the statute impose liability whether in the form of payment of redressive damages or being placed under an injunction *only for* conduct which 'subjects, or causes to be subjected' *the complainant* to a deprivation of a right secured by the Constitution and laws." *Id.* at 370–71 (emphasis added) (citation omitted). The Fifth Circuit follows *Rizzo*'s construction of section 1983, holding in *Coon v. Ledbetter*, 780 F.2d 1158 (5th Cir. 1986), that plaintiffs who invoke section 1983 are "required to prove some violation of their *personal* rights." *Id.* at 1160 (emphasis added); *see also id.* (citing with approval rulings from other federal courts that prohibit third-party litigation under section 1983). And in *Shaw v. Garrison*, 545 F.2d 980 (5th Cir. 1977) *rev'd on other grounds sub nom. Robertson v. Wegmann*, 436 U.S. 584 (1978), the Fifth Circuit allowed a section 1983 lawsuit to proceed only after concluding that it was "not an attempt

to sue under the civil rights statutes for deprivation of another's constitutional rights" and noting that "[s]uch suits are impermissible." *Id.* at 983 n.4. This Court cannot allow the plaintiffs' third-party claims to proceed under section 1983 without contradicting the binding pronouncements in *Rizzo*, *Coon*, and *Shaw*—not to mention the unambiguous language of section 1983.[4]

Doubtless the plaintiffs will respond by citing cases in which abortion providers successfully asserted third-party claims under section 1983 because the State's lawyers failed to object to this maneuver. *See, e.g.*, *Planned Parenthood of Se. Pa. v. Casey*, 744 F. Supp. 1323, 1325 (E.D. Pa. 1990) (noting that the plaintiff abortion providers challenged Pennsylvania's Abortion Control Act under 42 U.S.C. § 1983, while asserting the third-party rights of women). But when a State's lawyers forfeit this defense by failing to raise it—an all-too-common occurrence in abortion litigation—the case has no precedential value on whether plaintiffs may use section 1983 to assert the rights of non-litigant third parties. Cases such as *Casey* never discuss this issue because the parties didn't raise it; these types of cases cannot relieve future courts of their obligation to enforce the language of section 1983

---

[4] Other courts of appeals follow the text of 42 U.S.C. § 1983 by categorically excluding plaintiffs who try to invoke the rights of third parties—regardless of whether those plaintiff might satisfy the Supreme Court's doctrinal tests for third-party standing. *See, e.g.*, *Bates v. Sponberg*, 547 F.2d 325, 331 (6th Cir. 1976) ("42 U.S.C. § 1983 offers relief only to those persons whose federal statutory or federal constitutional rights have been violated."); *Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 801 (8th Cir. 2006) ("On an overbreadth challenge [plaintiff] would also be barred from collecting § 1983 damages which are available only for violations of a party's own constitutional rights."); *see Hunt v. City of Los Angeles*, 638 F.3d 703, 710 (9th Cir. 2011) ("Where a plaintiff challenges an ordinance based on the violation of third parties' rights, however, § 1983 damages are not available because there has been no violation of the plaintiff's own constitutional rights."); *Archuleta v. McShan*, 897 F.2d 495, 497 (10th Cir. 1990) ("We must also keep firmly in mind the well-settled principle that a section 1983 claim must be based upon the violation of plaintiff's personal rights, and not the rights of someone else."). *See also Estate of Gilliam ex rel. Waldrup v. City of Prattville*, 639 F.3d 1041, 1047 (11th Cir. 2011) ("[B]y its own terms, § 1983 grants the cause of action "to the party injured."); *Andrews v. Neer*, 253 F.3d 1052, 1056 (8th Cir. 2001) ("Under § 1983, state actors who infringe the constitutional rights of an individual are liable "to the party injured."); *Claybrook v. Birchwell*, 199 F.3d 350, 357 (6th Cir. 2000) ("[A] section 1983 cause of action is entirely personal to the direct victim of the alleged constitutional tort."); *Garrett v. Clarke*, 147 F.3d 745, 746 (8th Cir. 1998) ("Garrett may not base his Section 1983 action on a violation of the rights of third parties.").

when the State's lawyers preserve the issue.  That other States have forfeited this contention in past abortion cases does not in any way preclude the State of Texas from relying on it here.  *See, e.g.*, *Lewis*, 518 U.S. at 352 n.2.

The Declaratory Judgment Act imposes the same obstacle to the third-party claims in this case.  The text of the statute provides, in relevant part:

> In a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations *of any interested party seeking such declaration.*

28 U.S.C. § 2201 (emphasis added).  Like section 1983, the federal Declaratory Judgment Act establishes a limited cause of action, one that allows litigants to seek a declaration only of their *own* rights and legal relations.  By authorizing the federal courts to declare the rights and legal relations "of *any interested party seeking such declaration*," the Declaratory Judgment Act necessarily excludes actions brought to declare the rights or legal relations of non-parties—or anyone other than the party "seeking such declaration" under the Act.  *See* Currie, *Misunderstanding Standing*, 1981 SUP. CT. REV. 41.  It provides no authority for a federal court to declare the rights of those who are not "seeking" a declaration under the statute.

### III.  THE PLAINTIFFS IGNORE HB 2'S SEVERABILITY PROVISIONS BY ASSERTING THIRD-PARTY RIGHTS AND DEMANDING RELIEF ON BEHALF OF ALL THEIR PATIENTS AND PHYSICIANS.

There is a yet another, independent reason why the plaintiffs cannot sue on behalf of their patients or physicians:  HB 2's severability provisions forbid it.  There are two severability provisions in HB 2; each requires reviewing courts to sever *every discrete application* of HB 2 to *every individual woman*.  If a provision of HB 2 will not impose an "undue burden" when applied to any particular woman or group of women, then those constitutional applications must be severed from the allegedly invalid applications and allowed to remain in force.  Section 1(b) of the Act provides:

> The legislature intends that *every application of this statute to every individual woman shall be severable* from each other. In the unexpected event that the application of this statute is found to

impose an impermissible undue burden on any pregnant woman or group of pregnant women, *the application of the statute to those women shall be severed from the remaining applications of the statute that do not impose an undue burden*, and those remaining applications shall remain in force and unaffected, consistent with Section 10 of this Act.

HB 2 § 1(b) (emphasis added).  Section 10(b) of the Act drives the point home:

> Mindful of *Leavitt v. Jane L.*, 518 U.S. 137 (1996), in which in the context of determining the severability of a state statute regulating abortion the United States Supreme Court held that an explicit statement of legislative intent is controlling, it is the intent of the legislature that every provision, section, subsection, sentence, clause, phrase, or word in this Act, and every application of the provisions in this Act, are severable from each other. If any application of any provision in this Act to any person, group of persons, or circumstances is found by a court to be invalid, the remaining applications of that provision to all other persons and circumstances shall be severed and may not be affected.  All constitutionally valid applications of this Act shall be severed from any applications that a court finds to be invalid, leaving the valid applications in force, because it is the legislature's intent and priority that the valid applications be allowed to stand alone.  *Even if a reviewing court finds a provision of this Act to impose an undue burden in a large or substantial fraction of relevant cases, the applications that do not present an undue burden shall be severed from the remaining provisions and shall remain in force, and shall be treated as if the legislature had enacted a statute limited to the persons, group of persons, or circumstances for which the statute's application does not present an undue burden. . . .*

HB 2 § 10(b) (emphasis added).

The plaintiffs do not acknowledge these severability requirements in their brief.  But state severability law is mandatory and binding on federal courts.  *See Dorchy v. Kansas*, 264 U.S. 286, 290 (1924) (holding that a state court's "decision as to the severability of a provision is conclusive upon this Court."); *Leavitt v. Jane L.*, 518 U.S. 137, 138–39 (1996) (per curiam) (holding that "[s]everability is of course a matter of state law" and rebuking the Tenth Circuit for refusing to treat as dispositive a state abortion statute's "explicit[ ] stat[ement]" of severability); *Voting for Am., Inc. v. Steen*, No. 12-40914, 2013 WL 5493964, at *13 (5th Cir. Oct. 3, 2013) ("Severability is a state law issue that binds federal courts.").  And the Supreme Court has long enforced severability provisions that require reviewing courts to sever unconstitutional applications of state statutes, while leaving valid applications in force.  *See, e.g., Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 501 & 506 n.14 (1985); *Wyoming v. Oklahoma*, 502 U.S. 437, 460–61 (1992); *see also* RICHARD H. FALLON, JR., ET AL., HART &

WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 180–84 (5th ed. 2003) ("The notion that statutes are typically 'separable' or 'severable,' and that invalid applications can somehow be severed from valid applications without invalidating the statute as a whole, is deeply rooted in American constitutional law.").

By suing on behalf of *all* their patients, the plaintiff abortion clinics and physicians are violating HB 2's severability requirements and inviting this Court to do the same. This Court cannot enjoin HB 2's admitting-privileges requirement as applied to every patient of the plaintiffs, unless the plaintiffs demonstrate that there is no conceivable present or future patient for whom that requirement will not impose an "undue burden." That is an impossible showing for the plaintiffs to make. Doubtless there are *some* patients who can easily secure services from a doctor with the required hospital-admitting privileges after HB 2 takes effect, and applying HB 2's admitting-privileges requirement to this subset of women is perfectly constitutional. Allowing the plaintiff abortion clinics to sue on behalf of *all* their patients empowers the Court to enjoin the enforcement of HB 2 across the board—even as applied to the patients for whom the admitting-privileges requirement will not impose an undue burden. That is a violation of HB 2's severability language, which requires this Court to tailor its relief only to the specific subset of women who will be unduly burdened by HB 2's admitting-privileges requirement.

* * *

The only properly presented claims in this case are those brought by the plaintiff physicians (Drs. Braid, Robinson, and Richter), and only to the extent they assert rights belonging to themselves rather than their patients. The "undue burden" claims, and all claims brought by the plaintiff abortion clinics, should be dismissed for lack of third-party standing, lack of a cause of action, as an improper attempt to engage in representative litigation without satisfying the requirements of Rule 23, and as an improper attempt to circumvent HB 2's severability clauses.

## IV. THE STATE DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE PLAINTIFFS' CONSTITUTIONAL CLAIMS.

On the merits, HB 2 is constitutional.

The State believes that the constitutionality of HB 2 is a pure question of law, and does not turn on any of the factual allegations made by the plaintiffs. For that reason, the State does not object to this Court's decision to expedite trial with the goal of entering final judgment before October 29, 2013. That said, there are many disputed factual questions in this case. If the Court disagrees with the State and decides that the constitutionality of HB 2 turns on factual questions, the State doubts that this Court can lawfully resolve these factual disputes by holding an expedited trial. The declarations submitted by the plaintiffs are not admissible trial evidence, and the State must have an opportunity to depose and cross-examine witnesses that the plaintiffs present to prove their factual case. The State shares the Court's desire to resolve this matter expeditiously, but that should not be construed as a waiver of its evidentiary objections or an agreement to trial-by-hearsay to further that goal.

In the end, none of this should matter because the case can and should be resolved as a matter of law, and this Court should uphold the requirements of HB 2 as constitutional *per se*. The factual evidence that the plaintiffs seek to introduce is either irrelevant or insufficient to prove a constitutional violation. There is therefore no need for this Court to resolve any disputed questions of fact in the course of deciding this case.

### A. Supreme Court Decisions Restricting The States' Prerogative To Regulate Abortion Must Be Construed Narrowly.

We begin by acknowledging that there is some looseness in the "undue burden" standard established by *Planned Parenthood v. Casey*. The Supreme Court tells us that States are permitted to impose burdens and obstacles on women seeking abortions, but not "undue" burdens or "substantial" obstacles. These terms have play in the joints. *Exactly when* does a burden or obstacle

cross the line and become "undue" or "substantial"? The Supreme Court has provided some guideposts: 24-hour waiting periods, parental-notification laws, laws banning partial-birth abortion, and requirements that only licensed physicians perform abortions are *not* "undue burdens." *Gonzales*, 550 U.S. at 133; *Casey*, 505 U.S. at 885-87, 899-900; *Mazurek*, 520 U.S. at 968. But outside of laws specifically upheld or condemned by the Supreme Court, it is almost always possible to defend an abortion regulation as a non-undue burden or non-substantial obstacle, or to attack it as an undue burden or substantial obstacle. *Compare Stenberg*, 530 U.S. 914, *with Gonzales*, 550 U.S. 124; *see also Casey*, 505 U.S. at 878 (acknowledging that "disagreement is inevitable" in applying its undue-burden standard). When the Supreme Court's opinions can plausibly be read either to allow or forbid a State from enforcing a disputed abortion law, a lower court must interpret the Supreme Court's guidance in the manner most consistent with the text of the Constitution itself, and defer to the decisions of the State's democratically elected legislature.

### B. The Plaintiffs' Constitutional Challenges To HB 2's Hospital-Admitting Privileges Requirement Must Be Rejected.

The plaintiffs argue that HB 2's hospital-admitting privileges requirement: (1) Imposes an "undue burden" on patients; (2) Is unconstitutionally vague; (3) Violates the procedural due-process rights of physicians; and (4) Unlawfully delegates authority to hospitals. The State will address each of these in turn.

#### 1. The Plaintiffs' "Undue Burden" Challenges To HB 2's Hospital-Admitting Privileges Requirement Must Be Rejected.

The plaintiffs' "undue burden" challenge to the hospital-admitting privileges requirement must be rejected for three independent reasons.

First, the plaintiffs have insisted on bringing a facial challenge to the hospital-admitting privileges requirement, in the teeth of HB 2's severability clauses. Their facial challenge must be

rejected because the plaintiffs do not even allege (let alone prove) that every one of their present and future patients will be unduly burdened by HB 2's hospital-admitting privileges requirement.

Second, the types of burdens imposed by a hospital-admitting privileges requirement are akin to the burdens imposed by 24-hour waiting periods and laws that permit only licensed physicians to perform abortions—which the Supreme Court has held do *not* impose undue burdens. *See Casey*, 505 U.S. at 885-87; *Mazurek*, 520 U.S. at 973-74. The mere fact that a law may reduce the number of providers that can meet the health and safety standards prescribed by the Legislature, or require women to travel greater distances to see a physician who meets those requirements, is not sufficient to qualify as an "undue burden" under the Supreme Court's rulings in *Casey* or *Mazurek*. *See K.P. v. LeBlanc*, No. 12-30456, 2013 WL 4746488, at *9 (5th Cir. Sept. 4, 2013).

Third, the plaintiffs have not propounded evidence that would allow this Court to determine the extent to which HB 2's hospital-admitting privileges requirement will burden women, and there is no way for the plaintiffs to prove the extent of such burdens unless the law is allowed to take effect. *See A Woman's Choice—E. Side Women's Clinic v. Newman*, 305 F.3d 684, 693 (7th Cir. 2002) ("[I]t is an abuse of discretion for a district judge to issue a pre-enforcement injunction while the effects of the law (and reasons for those effects) are open to debate."). The plaintiffs cannot prove their case with the speculative, hearsay declarations that they have filed in this case. And although it is not necessary for the State to prove that a HB 2's hospital-admitting privileges requirement is medically necessary, there is ample medical justification for this requirement. *See* Love Decl. ¶¶ 4-13.

a.   **The Plaintiffs Cannot Succeed On A Facial Challenge To HB 2's Hospital-Admitting Privileges Requirement, Because They Do Not Allege Or Attempt To Prove That It Will Impose An "Undue Burden" On Every Patient Who Seeks An Abortion In Texas.**

The plaintiffs have brought a facial rather than as-applied challenge to the hospital-admitting privileges requirement, demanding that this Court enjoin its enforcement in *all* circumstances, as applied to *every* abortion patient in the State. Their facial challenge must be rejected out of hand, because they do not allege (and cannot possibly prove) that HB 2's hospital-admitting privileges requirement will unduly burden every abortion patient in the State.

First, sections 1(b) and 10(b) of HB 2 require reviewing courts to sever not only the discrete statutory provisions of HB 2, but also the statute's *applications* to every individual woman. *See* HB 2 § 1(b) ("The legislature intends that *every application of this statute to every individual woman shall be severable from each other.*") (emphasis added); *id.* § 10(b) ("[E]very application of the provisions in this Act[ ] [is] severable from each other."). That means that the plaintiffs cannot maintain a facial challenge unless they allege and prove that HB 2's hospital-admitting privileges requirement will unduly burden *every* abortion patient in the State. The severability provisions specifically provide that applications of HB 2 that do *not* present an undue burden as applied to any particular woman or group of women must be severed and allowed to remain in force. *See* HB 2 § 1(b) ("In the unexpected event that the application of this statute is found to impose an impermissible undue burden on any pregnant woman or group of pregnant women, *the application of the statute to those women shall be severed from the remaining applications of the statute that do not impose an undue burden*, and those remaining applications shall remain in force and unaffected, consistent with Section 10 of this Act.") (emphasis added); *id.* § 10(b).

The plaintiffs have yet to acknowledge HB 2's severability requirement. But they cannot maintain their facial challenge to the hospital-admitting privileges requirement in the face of this

severability language. Federal courts are bound to follow state severability law. *See Dorchy*, 264 U.S. at 290; *Leavitt*, 518 U.S. at 138; *Voting for Am., Inc.*, 2013 WL 5493964, at *13. And sections 1(b) and 10(b) are as clear a statement of legislative intent as one can possibly imagine. *See Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 330–31 (2006) (holding that "the touchstone for any decision about remedy is legislative intent" and remanding to determine "whether New Hampshire's legislature intended" courts to sever the unconstitutional applications of an abortion statute). This alone compels the Court to reject the plaintiffs' facial challenge to HB 2's hospital-admitting privileges requirement.

Even apart from the severability clauses in HB 2, the plaintiffs' facial challenge must *still* be rejected. The law of the Fifth Circuit forbids facial challenges unless the plaintiff shows that the law is invalid in *all* its applications; the only exception to this requirement is for First Amendment cases. *See Voting for Am., Inc.*, 2013 WL 5493964, at*2 ("With the exception of First Amendment cases, a facial challenge will succeed only if the plaintiff establishes that the act is invalid under all of its applications."); *Barnes v. Mississippi*, 992 F.2d 1335, 1342 (5th Cir. 1993) (holding that in an abortion case, "[a] facial challenge will succeed only where the plaintiff shows that there is *no* set of circumstances under which the statute would be constitutional").

In all events, section 10(b) specifically precludes a court from facially invalidating a provision of HB 2 based on the "large fraction" test that litigants challenging abortion laws often invoke. *See* HB 2 § 10(b) ("*Even if a reviewing court finds a provision of this Act to impose an undue burden in a large or substantial fraction of relevant cases, the applications that do not present an undue burden shall be severed* from the remaining provisions and shall remain in force, and shall be treated as if the legislature had enacted a statute limited to the persons, group of persons, or circumstances for which the statute's application does not present an undue burden.") (emphasis added). This moots any dispute over whether to apply the "large fraction" test or the "no set of circumstances" test for facial challenges. Either way,

the applications of HB 2 that do not impose an undue burden must be severed and allowed to remain in force.  The State is entitled to judgment on the plaintiffs' facial challenge to the hospital-admitting privileges requirement.  *See generally Ala. State Fed'n of Labor, Local Union No. 103 v. McAdory*, 325 U.S. 450, 465 (1945) ("When a statute is assailed as unconstitutional we are bound to assume the existence of any state of facts which would sustain the statute in whole or in part.").

> **b.  Whatever Burdens May Be Imposed By A Hospital-Admitting Privileges Requirement Are *Per Se* Lawful Under *Casey* and *Mazurek*.**

The Supreme Court has not yet ruled on whether a hospital-admitting privileges requirement imposes an "undue burden" on abortion patients.  But it has ruled that a 24-hour waiting period and a requirement that only licensed physicians perform abortions do *not* represent "undue burdens," even though these laws force women to travel greater distances and reduce the number of available abortion providers.  *See Casey*, 505 U.S. at 885–87, *Mazurek*, 520 U.S. at 973–74.  The plaintiffs allege that HB 2 will impose similar types of burdens, but these simply do not qualify as "undue" burdens under the Supreme Court's jurisprudence.

> **i.  Abortion regulations that impose increased travel burdens do not represent an "undue burden."**

The plaintiffs *must* acknowledge that States may enforce at least some laws that increase the travel burdens associated with abortion.  Otherwise the Supreme Court could not have upheld 24-hour waiting periods in *Casey*.  The district court in that case specifically found that Pennsylvania's 24-hour waiting period would be "particularly burdensome" for women who must travel long distances, and further found "the practical effect will often be a delay of much more than a day because the waiting period requires that a patient make at least two visits to the doctor."  505 U.S. at 885–86.  The Supreme Court upheld the law *in spite of these findings*.  The Court ruled that the law did

not impose an undue burden, even as it accepted the district court's finding that "the waiting period has the effect of 'increasing the cost and risk of delay of abortions.'" *Id.* at 886.

The plaintiffs claim that HB 2 imposes an undue burden because it will cause "[a]t least 1 in 12 women seeking abortions . . . to travel over 100 miles to a provider." *See* PI Motion 8. An identical argument was made and rejected in *Casey*. The petitioners' brief in *Casey* fully briefed the Court on the purported burdens of long-distance travel associated with Pennsylvania's law. 1992 WL 551419, at *10 (citations omitted). Yet the Supreme Court held in *Casey* that these added burdens were not "undue," and these added obstacles were not "substantial." 505 U.S. at 885–86. If Pennsylvania can enforce a law that causes abortion patients who must already travel more than one hundred miles to make an additional hundred-mile trip, it logically follows that Texas can enact a law that allegedly causes 1 in 12 patients to travel more than 100 miles to their nearest abortion provider—especially when Texas (unlike Pennsylvania) *exempts* women who must travel that distance from the requirement to wait 24 hours after informed consent before the abortion can be performed. TEX. HEALTH & SAFETY CODE § 171.012(a)(4).[5]

It is not plausible to believe that the "undue burden" test allows States to enforce some laws that cause abortion patients to travel hundred-mile distances but not others. If the plaintiffs believe this is the case, they must explain how a court can simultaneously conclude that the added travel burdens imposed by Pennsylvania's 24-hour waiting period are "due," but the added travel burdens imposed by Texas's hospital-admitting privileges requirement are "undue." It is preposterous to think that the "undue burden" test turns on whether a particular number or percentage of abortion patients must travel more than 100 miles to their nearest provider, as the plaintiffs suggest in their

---

[5] The plaintiffs falsely assert that the Texas legislature has "acknowledged" that a 100-mile trip to an abortion is "unduly burdensome" by its decision to exempt women who must travel that distance from the 24-hour waiting period. *See* PI Motion 8. That dispensation was extended as a matter of legislative prerogative, not because the Constitution or Supreme Court doctrine required such an exemption. *Casey*'s holding proves that such an exemption is not constitutionally required.

brief. *See* PI Motion 8. The plaintiffs seem to believe that 100 miles of travel distance tips the scales between a "due" and "undue" burden, but that cannot be reconciled with *Casey*, and the plaintiffs never explain why this Court should accord talismanic significance to 100 miles (as opposed to 90, or 150, or 400 miles). And in all events, even if the plaintiffs' theory of "undue burden" were correct, HB 2's severability clause would permit the State to continue enforcing its hospital-admitting privileges requirements against doctors who perform abortions on the approximately 90% of abortion patients who will *not* need to travel 100 miles to their nearest abortion provider.

The holding of *Casey* is clear: Added travel costs do not constitute an "undue burden," even though the law upheld in *Casey* added hundreds of miles in travel for some abortion patients. Courts applying the undue-burden test are not to draw arbitrary distinctions between "due" and "undue" travel burdens. It is not the *quantity* of the burden imposed (which is impossible for any court to measure), but the *type* of burden, that matters under "undue burden" analysis. Inconveniences associated with added travel costs simply do not qualify as an "undue burden." *See Karlin v. Foust*, 188 F.3d 446, 481 (7th Cir. 1999) ("[I]nconvenience, even severe inconvenience, is not an undue burden."); *Greenville Women's Clinic v. Bryant*, 222 F.3d 157, 170 (4th Cir. 2000) (rejecting an "undue burden" challenge to a South Carolina abortion regulation that might cause a Beaufort clinic to close, because "no evidence suggests that women in Beaufort could not go to the clinic in Charleston, some 70 miles away"); *Fargo Women's Health Org. v. Schafer*, 18 F.3d 526, 533 (8th Cir. 1994) (upholding a 24-hour waiting period and holding that "[w]e do not believe a . . . single trip, *whatever the distance to the medical facility*, create[s] an undue burden") (emphasis added).

### ii.    Laws establishing qualifications for persons performing abortions do not represent an "undue burden."

The plaintiffs must likewise concede that States may enforce at least *some* laws that establish qualifications for abortion providers. Otherwise Supreme Court could not have upheld state laws

that allow only licensed physicians to perform abortions. *See Mazurek*, 520 U.S. at 968. Physician-only requirements curtail the scope of available abortion providers, as they exclude nurse practitioners, midwives, and physician assistants from performing the procedure and offering their services in medically underserved areas of the State. Yet *Mazurek* makes clear that this is not an "undue burden," no matter how much these laws restrict access to abortion, and even if the evidence proves that non-physicians are equally capable of performing abortions without endangering the pregnant woman's health. *See id.* at 973 (noting that "the only extant study comparing the complication rates for first-trimester abortions performed by [physician-assistants] with those for first-trimester abortions performed by physicians found no significant difference" but holding that "the Constitution gives the States broad latitude to decide that particular functions may be performed only by licensed professionals, *even if an objective assessment might suggest that those same tasks could be performed by others*") (emphasis in original) (citaitions and internal quotation marks omitted).

The plaintiffs' brief does not cite *Mazurek*, and makes no effort to reconcile its arguments with *Mazurek*'s holding. Instead, the plaintiffs rely on district-court opinions and vacated panel opinions that have no precedential effect in this Court. *See* PI Motion 7.[6] But *Mazurek* holds that the burdens imposed by physician-only laws are *per se* lawful. *See A Woman's Choice—E. Side Women's Clinic*, 305 F.3d at 688 ("The Court has held it constitutional to prevent non-physicians from performing abortions, without factual inquiries into whether other medical professionals could do the job as safely, and how much prices may be elevated by a physician-only rule.") (citation omitted);

---

[6] The panel opinion in *Okpalobi v. Foster*, 190 F.3d 337 (5th Cir. 1999), was vacated when the court of appeals granted rehearing en banc. When a judicial opinion is vacated, its "ruling and guidance" are "erased." *See Windsor*, 133 S. Ct. at 2688. The district-court opinions have no precedential value even in the same district court that decided them. *See, e.g., Camreta v. Greene*, 131 S. Ct. 2020, 2033 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." (quoting 18 J. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 134.02[1][d], at 134–26 (3d ed. 2011))).

*id.* at 692 ("[I]n *Mazurek* the Court assumed that a statute preventing nurses and other skilled medical personnel whose training falls short of the M.D. from performing abortions would increase the expense (and thus, by the Law of Demand, reduce the number) of abortions; this again was held insufficient to show invalidity even on the assumption that one legislative purpose was to curtail abortion.").

If States may require abortion providers to be licensed physicians, then States may establish other qualifications, including a requirement that abortion providers be licensed physicians with hospital-admitting privileges. There is no need to consider the plaintiffs' contention that HB 2's hospital-admitting privileges requirement is "medically unnecessary." *See* PI Motion 2–6. Similar arguments were presented in *Mazurek*, and the Supreme Court deemed them irrelevant. *See* 520 U.S. at 973. And it does not matter whether the State imposes hospital-admitting privileges requirements on doctors who perform other types of outpatient surgery. *See* PI Motion 5. Courts have repeatedly held that States are permitted to impose abortion-specific regulations without extending those requirements to other medical procedures. *See Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 67 (1976) (upholding requirement of written consent for abortion even though not imposed on other surgical procedures); *Women's Health Center of W. Cnty., Inc. v. Webster*, 871 F.2d 1377, 1381 (8th Cir. 1989) (rejecting constitutional challenge to law that "places more stringent requirements on abortions than on other surgical procedures."). As the Supreme Court has explained, "Abortion is inherently different from other medical procedures, because no other procedure involves the purposeful termination of [fetal] life." *Harris v. McRae*, 448 U.S. 297, 325 (1980). Nor is there any need to resolve the plaintiffs' speculative claim that HB 2's admitting-privileges requirement will cause one-third of the State's license abortion clinics to cease performing the procedure. Laws that prohibit non-physicians from performing abortions also have drastic effects on the supply of abortion providers, and that is not a basis on which to find an "undue burden."

The alleged burdens imposed by HB 2's hospital-admitting privileges requirement are similar to the burdens imposed by Pennsylvania's 24-hour waiting period and Montana's physician-only requirement—and we know from *Casey* and *Mazurek* that burdens of this sort do not qualify as "undue." The hospital-admitting privileges requirement should be upheld by analogy to those laws, without delving into the factual questions surrounding how many abortion clinics will cease performing abortions, or how many women will have to travel more than 100 miles to obtain an abortion. Those factual questions are as irrelevant as they were in *Casey* and *Mazurek*. And even if HB 2 made it "difficult" or "prohibitively difficult" for certain abortion providers to meet the health and safety standards prescribed by the Legislature, that is insufficient to make the burden "undue." *See LeBlanc*, 2013 WL 4746488, at *9. Burdens will doubtless be imposed on some patients and providers, but these are not the types of burdens that the Supreme Court or the Fifth Circuit regards as "undue."

> **c. The Plaintiffs Have Failed To Provide Sufficient Evidence That HB 2's Admitting-Privileges Requirement Would Impose "Undue Burdens" on Patients, And the Plaintiffs Cannot Prove Their Case Until the Law Takes Effect.**

Even if this Court were to consider the plaintiffs' evidence, it is woefully insufficient to prove by a preponderance of the evidence that HB 2's hospital-admitting privileges requirement will unduly burden abortion patients. And their evidence is assuredly not sufficient to prove that HB 2's hospital-admitting privileges requirement will impose "undue burdens" on *every* abortion patient in Texas. The plaintiffs' declarations are rife with hearsay and vague, speculative, and unsubstantiated allegations. Very little of it would be admissible trial evidence, even if the declarants had subjected themselves to the discovery process and cross-examination in court.

The plaintiffs face another insurmountable problem of proof: It is impossible to prove the impact of HB 2's hospital-admitting privileges requirement unless the law is allowed to take effect,

and it is an abuse of discretion for a district court to enjoin the enforcement of an abortion law when the future effects of that law are disputed by the litigants. *See A Woman's Choice—E. Side Women's Clinic*, 305 F.3d at 693 ("[I]t is an abuse of discretion for a district judge to issue a pre-enforcement injunction while the effects of the law (and reasons for those effects) are open to debate. . . . Indiana . . . is entitled to put its law into effect and have that law judged by its own consequences."); *see also Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710 (5th Cir. 2012).

Perhaps aware of the difficulties that they face in *proving* that HB 2's hospital-admitting privileges requirement will unduly burden abortion patients, the plaintiffs make the audacious claim that burden of proof rests with the *defendants* rather than the plaintiffs. *See* PI Motion 2 ("[W]hen a state purports to regulate abortion in the interest of women's health, it is the state's burden to prove that such regulations actually advance that interest."). That is nonsense, and it is directly contradicted by *Mazurek*, *Casey*, and numerous other court decisions. *See Mazurek*, 520 U.S. at 971; *Casey*, 505 U.S. at 900–01 (upholding Pennsylvania's recordkeeping and reporting requirements because they "relate to health," without assigning the burden of proof to the State); *id.* at 884 (upholding Pennsylvania's requirement that a physician, rather than a qualified assistant, provide informed-consent information, because "there is no evidence on this record that requiring a doctor to give the information as provided by the statute would amount in practical terms to a substantial obstacle to a woman seeking an abortion"); *Greenville Women's Clinic*, 222 F.3d at 163 (holding that plaintiff abortion clinics bore "a heavy burden" of proof when bringing a facial challenge to abortion-clinic safety regulations). Abortion-safety laws are not presumed unconstitutional until the State proves medical necessity in court. The pre-*Casey* authorities that the plaintiffs cite all applied the "strict scrutiny" regime of *Roe v. Wade*. *See* PI Motion 3. But *Casey* jettisoned that regime and replaced it with a far more lenient "undue burden" standard.

The plaintiffs are also wrong to assert that state abortion regulations must be "consistent with accepted medical practice." PI Motion 3. *Casey* squelched that idea when it upheld Pennsylvania's informed-consent law, even though the district court in that case had entered findings of fact that Pennsylvania's law conflicted with "standard medical practice." *See Planned Parenthood of Se. Pa. v. Casey*, 744 F. Supp. 1323, 1353 (E.D. Pa. 1990) ("214. . . . *Content-based informed consent is contrary to the standard medical practice* that informed consent be specifically tailored to the needs of the specific patient." (emphasis added)). The petitioners' brief in *Casey* had also argued that Pennsylvania's informed-consent law contradicted accepted medical practice. 1992 WL 551419, *9 (arguing that Pennsylvania's informed-consent law "intrudes heavily on physicians' discretion by requiring them to supply a specified package of information to all patients. This conflicts with the accepted medical practice of giving patients information tailored to their individual needs and circumstances."). But the Supreme Court upheld the law notwithstanding these concerns, and without reversing the district court's finding of fact as clearly erroneous. *Casey*, 505 U.S. at 883; *see also Gonzales v. Carhart,* 550 U.S. at 163 ("The law need not give abortion doctors unfettered choice in the course of their medical practice."); *id.* at 157 ("[T]he State has a significant role to play in regulating the medical profession."); *id.* at 158 ("Where it has a rational basis to act, and it does not impose an undue burden, the State may use its regulatory power to bar certain procedures and substitute others, all in furtherance of its legitimate interests in regulating the medical profession in order to promote respect for life, including life of the unborn."). Federal courts are not to serve as "the country's *ex officio* medical board with powers to approve or disapprove medical and operative practices and standards throughout the United States." *Id.* at 164 (citation and internal quotation marks omitted).

The burden therefore falls on the plaintiffs to prove, by a preponderance of the evidence, that HB 2's hospital-admitting privilege requirement will impose an "undue burden" on abortion

patients. And to succeed on their facial challenge, the plaintiffs must prove that HB 2 will impose an undue burden on *every* patient who seeks an abortion. It is not enough for the plaintiffs to prove that HB 2's hospital-admitting privilege requirement is "medically unnecessary"; they must *also* prove that it has "the purpose or effect of presenting a substantial obstacle" to patients seeking an abortion. *See Casey*, 505 U.S. at 878 ("Unnecessary health regulations *that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion* impose an undue burden on the right.") (emphasis added). Their evidence comes nowhere close to proving these contentions.

> i. **The plaintiffs have failed to prove, by a preponderance of the evidence, that HB 2's hospital-admitting privileges requirement provides no health or safety benefits.**

HB 2's hospital-admitting privileges requirement promotes the health and safety of patients in at least two respects. First, it serves as a quality-control mechanism because hospitals are unlikely to grant admitting privileges to disreputable or poorly trained physicians. Second, it ensures continuity of care if an abortion patient must be transferred to the hospital. Not all hospitals have OB/GYNs on call, and HB 2's hospital-admitting privileges requirement helps ensure that at least one OB/GYN (the doctor who performed the abortion) will be available on a 24-hour basis to deal with any complications that might arise. *See* Love Decl. ¶¶ 7-8; Thorp Decl. ¶¶ 12, 32, 41; Anderson Decl. ¶¶ 5, 10.

The plaintiffs offer a declaration from Dr. Fine, who opines that HB 2's hospital-admitting privilege requirement is medically unnecessary. But the plaintiffs cannot prove this fact with a declaration from a witness that the State has had no opportunity to depose or cross-examine. In all events, Fine's declaration says nothing to rebut the quality-control rationale for HB 2's hospital-admitting privilege requirement. It has become clear that merely requiring abortion providers to hold medical degrees is not sufficient to ensure high-quality care—and these quality-control

problems extend well beyond Kermit Gosnell. *See* Denise Lavoie, *Doctor Gets 6 Months in Abortion Patient Death*, ASSOCIATED PRESS, Sept. 14, 2010 (reporting that Rapin Osathanondh was pleading guilty to involuntary manslaughter in the case of a woman who died after he performed an abortion on her); Lynette Holloway, *Abortion Doctor Guilty of Murder*, N.Y. TIMES, Aug. 9, 1995, (reporting that Dr. David Benjamin was convicted of second-degree murder resulting from a botched abortion). HB 2's hospital-admitting privilege requirement will help protect patients by ensuring that the physician who performs an abortion is sufficiently credentialed to obtain admitting privileges at at least one hospital. *See* Love Decl. ¶¶ 4-13.

As for the continuity of care, Dr. Fine acknowledges that complications may arise following abortions, and that these will on occasion require hospitalization. *See* Fine Decl. ¶¶ 6-14. Dr. Fine claims that patients needing hospital care can simply appear at the emergency room and receive treatment from the hospital's OB/GYN. *Id.* ¶ 19. But not all hospitals have OB/GYNs on call, and requiring the abortion-performing doctor to have admitting privileges at the hospital ameliorates this problem and ensures that at least one OB/GYN will be available. *See* Love Decl. ¶ 7; Thorp Decl. ¶ 41 ("Nationally, 73% of emergency departments report inadequate on-call coverage by specialist physicians, including obstetricians/gynecologists who are particularly difficult to secure."). Dropping a patient off at the hospital door also leads to dangerous breakdowns in communication between doctors. Dr. Thorp describes one study examining physicians without admitting privileges who had their patients emergently hospitalized and treated by a hospitalist, and reports that approximately half of those patients were admitted with at least one medication error. Thorp Decl. ¶ 42. Dr. Thorp also reports estimates by a joint commission including Johns Hopkins, Mayo clinic, and New York Presbyterian that "80 percent of serious medical errors involve miscommunication between caregivers when patients are transferred or handed-off." Thorp Decl. ¶ 48. Dr. Fine's

declaration falls far short of proving that HB 2's hospital-admitting requirement has no benefits for patient safety.

*At most*, the plaintiffs have shown that medical experts disagree on the extent to which HB2's hospital-admitting privileges requirement promotes patient safety. But the mere existence of disagreement in medical opinion on this question is enough to *require* a judgment for the State. *See Gonzales*, 550 U.S. at 163 ("The Court has given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty.").

> ii. **The plaintiffs have failed to prove, by a preponderance of the evidence, that HB 2's hospital-admitting privileges requirement imposes a "substantial obstacle" on all abortion patients in Texas.**

Even if the plaintiffs could prove that HB 2's hospital-admitting requirement has no relationship to patient safety, they cannot prove by a preponderance of the evidence that it imposes a "substantial obstacle" on any patient seeking an abortion.

The plaintiffs claim that abortion-performing doctors will have difficulty obtaining admitting privileges because "many hospitals require that physicians admit a certain number of patients per year in order to maintain privileges." PI Motion 4. But the plaintiffs do not identify the names of those hospitals, they do not provide any documentation or proof that these policies exist, and they do not tell the Court how many hospitals in the State impose this requirement. The plaintiffs cannot prove their case without providing these details and backing them up with concrete evidence. Andrea Ferrigno's declaration is equally vague. "[S]ome hospitals require that a physician live within a certain distance of the hospital, or that the physician be board certified. Others require a certain minimum number of hospital admissions or in-hospital procedures per year." Ferrigno Decl. ¶ 11. *Which* hospitals? How many? Ferrigno refuses to say. This leaves the State (and the Court) without any means to verify whether these assertions are true, and without any idea of how widespread of a

problem this is. St. David's Medical Center, for example, does not require physicians with admitting privileges to admit *any* patients to the hospital, nor does it impose geographic restrictions on a doctor's place of residence. *See* Love Decl. ¶ 11. So we know that there are at least *some* hospitals in Texas that do not impose a minimum-admissions or residency requirement, yet the plaintiffs—who bear the burden of proof—have failed to provide any evidence of how many hospitals adhere to these policies. For all we know, the vast majority of hospitals in Texas impose no such requirements.

In addition, both federal and Texas law prohibit hospitals from discriminating against doctors who perform abortions. 42 U.S.C. § 300a-7(c)(1); TEX. OCC. CODE §103.002(b). The plaintiffs suggest that hospitals may be unwilling to extend admitting privileges to abortion providers. *See* Ferrigno Decl. ¶ 10; Jordan Decl. ¶¶ 8–10. But discrimination of that sort would be illegal, and the plaintiffs have not proven by a preponderance of the evidence that any hospital in Texas has violated or will violate the law in this manner. Ferrigno and Jordan refuse even to name the hospitals that they claim have unlawfully discriminated against them. The plaintiffs cannot expect this Court to simply guess at how widespread a problem this is.

Finally, to prove their case, the plaintiffs must demonstrate: (1) Which physicians will be unable to obtain admitting privileges before HB 2 takes effect; (2) Whether those physicians have made reasonable, good-faith efforts to obtain admitting privileges before the law takes effect; and (3) Whether the patients served by those physicians will be "unduly burdened" if their physician must cease performing abortions. The plaintiffs' evidence on issue (1) is simply insufficient. No physician other than Darrel Jordan has submitted a declaration explaining whether he will be able to secure admitting privileges, and the declarations from Ferrigno, Jordan, and Martinez discuss only a subset of the abortion-performing physicians in this case. For many of the plaintiffs there is zero evidence of whether they or their physician-employees are unable to obtain admitting privileges.

Perhaps the plaintiffs are planning to rely on the allegations in their complaint, but the State denies the complaint's allegations, and in all events the complaint does not allege that any of the physicians are *unable* to obtain admitting privileges (it alleges only that they lack those privileges).

The plaintiffs have also failed to produce any evidence on issue (2). This Court has no way to know whether a physician who lacks hospital-admitting privileges is in that predicament because he is truly unable to obtain those privileges or because he hasn't tried hard enough to get them (perhaps because he is hoping that the courts will enjoin the law and relieve him of that obligation). The mere fact that an abortion practitioner lacks hospital-admitting privileges before HB 2 takes effect is not evidence that he is *unable* to obtain those privileges, and it is the plaintiffs' responsibility to prove that a physician who lacks admitting privileges made a reasonable effort to obtain them and was thwarted in those efforts.

Finally, on issue (3), the plaintiffs' only evidence is a declaration from Joseph Potter, who claims to have conducted a project to evaluate the impact of HB 2's hospital admitting-privilege requirement. Potter's declaration does not satisfy the standards of Federal Rule of Evidence 702 or *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S 579, 595 (1993), and it should not be relied upon. Potter asserts that "at least one third of currently licensed clinics will stop providing abortions entirely," but he does not apply any methodology to reach that conclusion, and he does not even explain how he came up with that figure. *See* Potter Decl. ¶ 6. Expert testimony must be reasoned and use the methodology of a discipline. *Ipse dixits* of this sort are not acceptable, and they assuredly cannot serve as the starting point for an expert's analysis.

Potter appears to have assumed (although he does not say this) that every abortion practitioner who lacked hospital-admitting privileges on the date that the plaintiffs filed their complaint is unable to obtain hospital-admitting privileges and will never be able to obtain them in the future. That is not a tenable assumption. For qualified physicians, hospital-admitting privileges

are easy to obtain; St. David's Medical Center will issue them to any physician who can demonstrate training and competence.  *See* Love Decl. ¶ 11.  What's more, abortion-performing doctors will have great incentives to find a hospital that will grant them admitting privileges once HB 2 is allowed to take effect; those incentives are muted right now because of the possibility that HB 2 could be enjoined.  Andrea Ferrigno's declaration claims that numerous abortion-performing doctors are waiting to hear back from hospitals to which they have applied for admitting privileges; Potter's declaration assumes (without any basis) that *all* of those applications will be rejected.  *See* Ferrigno Decl. ¶ 14.  And doubtless there are other abortion-performing physicians besides the ones mentioned in Ferrigno's declaration who have pending applications for hospital-admitting privileges.

Potter also fails to explain how he determined the post-HB 2 capacity of abortion providers. He appears to have assumed that a provider's capacity to take additional patients cannot exceed the total volume of abortions that it performed in 2011.  Potter Decl. ¶ 12.c, g.  But there is no basis for assuming that abortion providers in Texas are incapable of taking on more patients if the demand for their services increases in 2014, or that new clinics will not open in response to unmet demand. Uhlenberg Decl. ¶¶ 8-15; Harvey Decl. ¶¶ 8-32. Potter also assumes (without any basis) that no new doctors will begin performing abortions in Texas after HB 2 goes into effect.  *Id.*

Finally, Potter fails to explain numerous aspects of his analysis, making it impossible for the Court to evaluate the reliability of his methods.  He describes his research as including DSHS information, information from the plaintiffs, and information from "key informants."  *Id.* ¶ 9. Without knowing who those "key informants" are, there is no way to test the validity of Dr. Potter's analysis.  Likewise, after stating that demand for abortions in Texas will exceed providers' ability to perform them by 25,039, he arbitrarily states that 89% of that is due to HB 2.  *Id.* ¶ 12.  There is no explanation of how he arrived at that figure.  When discussing the capacity of Harris County to meet the demand for abortions, Dr. Potter simply states "we doubt" the remaining clinics can meet

demand, and then asserts in Table 3 that the capacity deficit in Harris County will be 3258. *Id.* ¶ 12.d, Table 3. He does not explain how the "doubt" of himself and other unnamed individuals meets any scientific standard of reliability.

Potter's declaration flunks the reliability standards of *Daubert* and Fed. R. Evid. 703, and it should not be given any weight by this Court.

> ### d.     The District-Court Decisions Cited By the Plaintiffs Offer No Support For Enjoining HB 2's Hospital-Admitting Privileges Requirement.

The plaintiffs rely on three district-court decisions enjoining hospital admitting-privileges requirements. *See* PI Motion 3, 7 (citing *Planned Parenthood Southeast, Inc. v. Bentley*, No. 2:13-CV-405-MHT, 2013 WL 3287109 (M.D. Ala. June 28, 2013), *Jackson Women's Health Org. v. Currier*, 878 F. Supp. 2d 714 (S. D. Miss. 2012); *Planned Parenthood of Wisconsin v. Van Hollen*, No. 3:13-CV-00465, 2013 WL 3989238 (D. Wis. Aug. 2, 2013)). Opinions of federal district courts have no precedential value and may be followed only to the extent they offer persuasive *reasons* for their decision. *See, e.g.*, *Camreta*, 131 S. Ct. at 2033 n.7 ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." (citation and internal quotation marks omitted). None of these opinions offer persuasive reasons for this Court to enjoin HB 2's hospital-admitting privileges requirement.

First, none of the statutes in those cases contained the severability language that appears in HB 2. Had those district courts adjudicated a challenge to HB 2, they would have been compelled to enforce the severability clause and reject the facial challenge that the plaintiffs were presenting in their cases. All *applications* of HB 2's provisions must be severed from each other, and no facial challenge can be maintained absent proof of invalidity in all its applications.

Second, none of the cases cited by the plaintiffs answer the arguments that the State is presenting here. The district courts in *Bentley* and *Van Hollen*, for example, never even attempted to

explain how increased travel costs violate the "undue burden" standard when *Casey* upheld a 24-hour waiting requirement that imposed considerable travel costs on abortion patients.

Third, all of those cases involved preliminary injunctions, not final judgments. At the preliminary-injunction stage, the plaintiffs need only show a "likelihood" of success on the merits. The plaintiffs' burden is much higher at this stage of the proceedings: They must *prove* by a preponderance of admissible trial evidence that a hospital-admitting privileges requirement unduly burdens women. None of the cases cited provide that proof, and none of them make factual findings based on trial evidence. Far more persuasive (and relevant) is the Eighth Circuit's ruling in *Women's Health Center v. Webster*, 871 F.2d 1377, 1380–81 (8th Cir. 1989), which upheld Missouri's requirement that abortion-performing doctors hold surgical privileges at some hospital in the State.

### 2. The Plaintiffs' Vagueness Challenges To HB 2's Hospital-Admitting Privileges Requirement Must Be Rejected.

The plaintiffs' vagueness challenges to the phrase "active admitting privileges" are meritless. "Active admitting privileges" means only privileges that are current and unexpired, and that is the natural and obvious meaning of the statute. The plaintiffs' vagueness challenges must be rejected for two independent reasons.

First, the state officials charged with enforcing with the statute, and the lawyers representing those officials, have assured the Court that the phrase "active admitting privileges" means only admitting privileges that are current and unexpired, and the State will not enforce HB 2 in a manner that requires abortion-performing doctors to hold any other type of hospital privileges. *See* Connolly Decl. ¶ 5. Federal courts must defer to the interpretations of state officials charged with enforcing a state statute—even when those officials announce their interpretations in the court proceedings challenging the statute. *See, e.g.*, *Frisby v. Schultz*, 487 U.S. 474, 483 (1988) (construing a town ordinance "more narrowly" in part because "[t]his narrow reading is supported by the

representations of counsel for the town at oral argument."); *Doe v. Bolton*, 410 U.S. at 183 n.5 (interpreting a "rape" exception in a Georgia abortion statute to include incest because "[w]e were assured by the State at reargument that this was because the statute's reference to 'rape' was intended to include incest"); *Bellotti v. Baird*, 428 U.S. 132, 143 (1976) ("The interpretation placed on the statute by appellants in this Court is of some importance and merits attention, for they are the officials charged with enforcement of the statute."); *Voting for Am., Inc.*, 2013 WL 5493964, at *3, *12; *Hamer v. Musselwhite*, 376 F.2d 479, 481 (5th Cir. 1967).

Second, federal courts must construe state statutes to avoid constitutional problems. *See Ohio v. Akron Ctr. for Reprod. Health*, 497 U.S. 502, 514 (1990) (*Akron II*). This court can obviate the plaintiff's vagueness challenge by accepting the State's construction of the statute, and limiting the phrase "active admitting privileges" to admitting privileges that are current and unexpired. So long as that interpretation qualifies as a permissible construction of the statutory language, it must be adopted by this Court under the canon of constitutional avoidance. The duty of federal courts to impose saving constructions on state statutes is universal, and it applies with full force in void-for-vagueness challenges, *see United States v. Vuitch*, 402 U.S. 62, 70 (1971), *Buckley v. Valeo*, 424 U.S. 1, 44 (1976), and in abortion litigation, *see Akron II*, 497 U.S. at 514 (declaring that "[w]here fairly possible, courts should construe a statute to avoid a danger of unconstitutionality" and describing this as a "well-known rule[] of construction *discussed in our abortion cases and elsewhere*") (emphasis added); *Gonzales*, 550 U.S. at 153-54 (reaffirming that in abortion cases, "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality") (citation omitted).

3. **The Plaintiffs' Procedural Due Process Challenges To HB 2's Hospital-Admitting Privileges Requirement Must Be Rejected.**

The plaintiffs' procedural due-process claim is hard to understand. They complain that they need more time to secure admitting privileges before HB 2 takes effect, but how is that a *procedural*

due process violation? HB 2 is a validly enacted law, so any "depriv[ation]" of "liberty" that the plaintiffs will suffer is by definition accompanied by "due process of law." None of the cases cited in this section of the plaintiffs' brief even remotely supports their argument.

> **4.     The Plaintiffs' "Unlawful Delegation" Challenge To HB 2's Hospital-Admitting Privileges Requirement Must Be Rejected.**

The plaintiffs do not develop this claim in their brief. Refuting it requires little more than a citation of some of the many court decisions upholding delegations to private entities. *See Currin v. Wallace*, 306 U.S. 1 (1939); *United States v. Rock Royal Co-operative*, 307 U.S. 533, 577 (1939); *see also* 42 U.S.C. § 3796ii-1(1)(a) (defining "mental illness" according to "the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders published by the American Psychiatric Association."); *Women's Health Center v. Webster*, 871 F.2d 1377, 1382 (8th Cir. 1989) (rejecting non-delegation challenge to a requirement that abortionists have surgical privileges at a hospital).

> **C.     The Restrictions On Mifepristone Abortions Are Constitutional.**

The restrictions on mifepristone abortions should be upheld as constitutional on their face. There is no need for the Court to resolve the disputed factual questions between the plaintiffs and the State. But if the court decides to consider the evidence, the plaintiffs have failed to prove by a preponderance of the evidence that the restrictions on mifepristone abortions impose an "undue burden."

> **1.     *Mazurek v. Armstrong* and *Gonzales v. Carhart* Foreclose The Plaintiffs' Under-Burden Challenge.**

HB 2's health and safety regulations governing the use of mifepristone abortions cannot qualify as an "undue burden" for two reasons. First, just as States may seek to protect a patient's health and safety by requiring that a licensed physician perform surgical abortions, they may also require a licensed physician to administer abortion pills. *See Mazurek*, 520 U.S. at 974. There is no constitutional right to self-abort, and *Mazurek*'s holding is equally applicable to abortions performed

by ingesting drugs. Laws that require a physician's presence at the moment a patient ingests mifepristone or misoprostol are constitutional *per se*, and many other States have enacted laws requiring the physical presence of a physician whenever abortion drugs are ingested. *See* 2012 Kansas Stat. 65-4a10; Neb. Rev. Stat. § 28-335(2); Ariz. Rev. Stat. § 36-449.03; Ohio Rev. Code § 2919.123.

Second, HB 2's regulations on mifepristone abortions cannot qualify as an "undue burden" because surgical abortion remains available for women who find the restrictions onerous. The "undue burden" regime protects only a woman's right to decide *whether* she will have an abortion — it does not give women the right to choose the particular *method* by which abortions will be performed. *See Gonzales*, 550 U.S. at 133 (upholding federal ban on a particular abortion method).

The plaintiffs refuse to acknowledge *Mazurek*. Instead, they complain that there is no "justification" for requiring a physician to administer misoprotol. *See* PI Motion 15 n.9. But States need not provide *any* justification for requiring a physician's involvement in the abortion process. *See Mazurek*, 520 U.S. at 973–74. The plaintiffs also assert that "[m]edications prescribed by physicians are routinely and safely administered by other trained health professionals." *See* PI Motion 15 n.9. Perhaps so, but that is no more relevant than the argument made in *Mazurek* that physician-assistants are equally capable as physicians in performing first-trimester abortions. *Mazurek*, 520 U.S. at 973. The Supreme Court has spoken clearly on these matters: "[T]he Constitution gives the States broad latitude to decide that particular functions may be performed only by licensed professionals, *even if an objective assessment might suggest that those same tasks could be performed by others.*" *Id.* (quoting *Casey*, 505 U.S. at 885). Here, the State of Texas has decided that to protect the health and safety of its residents, misoprostol should be administered only by a licensed physician. *Mazurek* insulates that decision from judicial attack.

The plaintiffs recognize that *Gonzales* permits the States to ban particular methods of abortion and leave other methods available. *See* PI Motion 16. Given *Gonzales*'s holding, there should be no problem with a regime that limits mifepristone abortions to 49 days of gestational age, so long as surgical abortions remain available to abortion patients after that time. The plaintiffs nevertheless assert that States are forbidden to prohibit methods of abortion that are "common" (a term that they do not define)—even when other methods of abortion remain available. There is no authority to support this view. The two cases cited by the plaintiffs disapproved laws banning the "*most* commonly used" or "*usual*" method of second-trimester abortion. Mifepristone, however, is not the most commonly used or usual method of first-trimester abortion, and the vast majority of abortions performed in Texas are surgical. *See* http://www.dshs.state.tx.us/chs/vstat/vs11/t33.shtm (noting that in 2011, only 26% of abortions performed in Texas were done with mifespristone).

The plaintiffs' argument would also lead to the untenable conclusion that partial-birth abortion would have been immune from congressional prohibition if it had been "common" at the time that Congress outlawed it. But there is no language in *Gonzales* to suggest that the Court's conclusion turned on whether partial-birth abortion was "common" or "uncommon"; the Court approved the ban because of "ethical and moral concerns that justify a special prohibition." 550 U.S. at 158. Finally, the plaintiffs do not define the term "common" or provide a principled test for separating the "common" from the "uncommon" abortion procedure.

>    2.   **The Plaintiffs Have Failed to Prove By A Preponderance Of The Evidence That HB 2's Regulations Of Mifepristone Abortions Impose An Undue Burden.**

The plaintiffs bear the burden of proving by a preponderance of the evidence that HB 2's regulations of mifepristone will impose an "undue burden" on abortion patients. Medical abortions are more dangerous than surgical ones, yet, in plaintiffs' view, the Constitution somehow demands

that the former be performed with *no* supervision by anyone.  They have not met their burden of proof.

The medical justifications for HB 2's regulations of mifepristone are obvious.  Peer-reviewed studies have shown that medical abortions are more dangerous than surgical ones.  *See* Harrison Decl. ¶¶ 5-8.  As Dr. Harrison explains, the rate of hospitalization for women receiving medical abortions is *twelve times higher* than for women receiving surgical abortions.  *See id.* ¶ 5.  The overall incidence of adverse events is *four times higher* for women receiving medical abortions.  *See id.* ¶¶ 6, 13.  And the mortality rate from bacterial infection is *ten times higher* for women receiving medical abortions.  *See id.* ¶¶ 7-8, 48-51.  Indeed, plaintiffs' own expert (Dr. Fine) unwittingly provides the Court with vivid evidence of the dangers of medical abortion; *seven women died* using the sort of off-label regimen endorsed by Dr. Fine and the ACOG Practice Bulletin appended to his declaration.  *See* Harrison Decl. ¶ 22.  The most painful and difficult part of a medical abortion—and hence the part where medical supervision is most necessary—is the four-to-six hour window during which the fetus is expelled.  *Id.* ¶¶ 30-32; *see also* Johnson Decl. ¶¶ 12-32.  Given these dangers, the Legislature correctly concluded that the public-health risks associated with drugs that cause serious adverse events, hospitalization, and death outweigh the benefits of consuming such drugs in the "more private" confines and unsupervised "comfort[]" of women's homes.  PI Motion 15; *see also* Harrison Decl. ¶¶ 33-47 (FDA promulgated restrictions on medical abortion precisely in response to such safety concerns).

Far from imposing "harms" on women, PI Motion 14-18, HB 2 ameliorates them.  As Dr. Harrison explains, approximately 6% of medical-abortion recipients require surgery to complete their abortions, and many of those surgeries are performed on an emergency basis.  Harrison Decl. ¶¶ 12, 14.  Moreover, it is precisely the women who face potential risks and difficulties in having abortions who demonstrate the necessity of HB 2's regulations.  The very patients Dr. Fine cites as

unduly burdened by HB 2—for example, patients who have anomalies of the reproductive and genital tracts, such as large uterine fibroids or cervical stenosis, and women who cannot travel for follow-up appointments—should not have unsupervised medical abortions. *See* Harrison Decl. ¶¶ 10-12, 26-31. As Dr. Harrison explains, it defies sound medical judgment to subject women with preexisting high-risk characteristics to higher-risk medical abortions, and it is especially unsound to do so on an unsupervised basis. Yet, as a former director of a Planned Parenthood clinic explains, plaintiffs continue to encourage women to have medical abortions. *See* Johnson Decl. ¶¶ 3, 10, 34-37.

In all events, Dr. Fine's complaints that HB 2's regulations of mifepristone abortions are not "medically necessary" cannot establish an "undue burden" absent proof that the law also imposes substantial obstacles on patients seeking an abortion. *See Casey*, 505 U.S. at 878. All of the "burdens" alleged in Dr. Fine's affidavit can be avoided by choosing surgical abortion, and surgical abortions are safer for women after 49 days. *See* Harrison Decl. ¶¶ 24-25. And even for patients who stick with mifepristone, the plaintiffs have not proven that *every* woman seeking mifepristone abortions will suffer an "undue burden" under HB 2. Having to return to the clinic to ingest misoprostol is no more an "undue burden" than a requirement to wait 24 hours after receiving the informed-consent materials.

Finally, despite the fact that HB 2 was enacted to protect the health and safety of patients, the plaintiffs contend that the restrictions on mifepristone abortions may endanger some women's health. *See* PI Motion 16–17. But that is not a permissible basis for a facial challenge. *See Gonzales*, 550 U.S. 124. The plaintiffs gesture toward an as-applied challenge that would enjoin HB 2's regulations of mifepristone as applied to a particular subset of women, but that class is ill-defined. *See* PI Motion 18 (suggesting that the court enjoin HB 2's regulations "as applied to those women

for whom a medication abortion is necessary, in appropriate medical judgment, to protect their lives or health.").

*Gonzales* holds that health-exception carve-outs may be considered "if it can be shown that in *discrete and well-defined instances* a particular condition has or is likely to occur in which the procedure prohibited by the Act *must* be used." 550 U.S. at 167 (emphasis added). The plaintiffs have not made that showing here. Rather, they are seeking a free-floating health exception that can be invoked whenever a physician decides in his "medical judgment" that he should be allowed to violate HB 2. If a situation were ever to arise in which a woman's life or health is endangered by a pregnancy, and a surgical abortion is impossible because of a medical condition, then State officials assuredly will not punish or discipline a physician who prescribes mifepristone beyond the 49-day gestational age limit prescribed in HB 2. But the plaintiffs are asking for much more than that, and there is no basis on which this Court can grant that overbroad request.

### 3. *DeWine*'s Analysis Is More Persuasive Than *Cline* and *Burdick*.

Legislation similar to HB 2 has been challenged in both state and federal courts: *Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490 (6th Cir. 2012); *Okla. Coal. for Reprod. Justice v. Cline*, 292 P.3d 27 (Okla. 2012) (mem. op.) (per curiam), *cert. granted & question certified to Okla. Sup. Ct.*, 133 S. Ct. 2887 (2013); *MKB Mgmt. Corp. v. Burdick*, No. 09-2011-CV-02205, MEM. OP. & ORDER FOR PERM. INJ. (N.D. Dist. Ct., Cass Cnty., July 15, 2013), *available at* http://jurist.org/paperchase/2013-07-15_MKBvBurdick_Perm_Injunction.pdf (last visited Oct. 14, 2013). The Sixth Circuit upheld Ohio's materially identical statute banning off-label use against an undue-burden challenge, while the Oklahoma Supreme Court held that Oklahoma's medical-abortion legislation facially unconstitutional under *Casey*. A state district court permanently enjoined North Dakota's law, in part, as an undue burden under *Casey*. *DeWine*, 696 F.3d at 513-18; *Cline*, 292 P.2d at 27–28; *Burdick*, No. 09-2011-CV-02205, MEM. OP. & ORDER FOR PERM. INJ., at 45-49, 54-55.

The plaintiffs try to minimize *DeWine* by claiming that it has a "different factual record" from this case. *See* PI Motion 17 n.11. It is of course to be expected that there may be some statistical variations and differences in the relative costs of the procedures in the two states. But these differences are legally immaterial. What matters is that *DeWine* endorsed the distinction between a woman's right to decide *whether* to terminate a pregnancy and the right to choose a particular *method* of abortion. *DeWine*, 696 F.3d at 514–18. The Sixth Circuit's opinion is persuasive and should be followed; the plaintiffs say nothing that would call its reasoning into doubt.

*Cline* and *Burdick*, by contrast, are not reliable guides for undue-burden analysis. The Oklahoma Supreme Court's opinion in *Cline* contains no analysis, only a conclusory assertion that "this court is duty bound by the United States and the Oklahoma Constitutions to 'follow the mandate of the United States Supreme Court on matters of federal constitutional law,'" and that "[t]he challenged measure is facially unconstitutional pursuant to *Casey*." *Cline*, 292 P.2d at 27–28. The court does not endeavor to explain *why* the state act constitutes an undue burden. *Burdick* summarily dismissed, without any explanation, the distinction recognized in *DeWine* between the right to decide *whether* abort a fetus and the purported right to choose one's preferred method of abortion. *See MKB Mgmt. Corp. v. Burdick*, No. 09-2011-CV-02205, 2012 WL 1360641, at *43 (N.D. Dist. Ct., Cass Cnty., Feb. 16, 2013) (mem. op. & op. on mot. for temp. inj.) ("DOH argues a woman has no right to choose her preferred method of abortion, and states are free to ban specific methods providing at least one remains. There is no basis, either in law or medicine, for such conclusions." [record citation omitted]). Neither opinion presents reasoned analysis on these points, and they should not be followed.

### 4. The Plaintiffs Vagueness Challenges to HB 2's Regulations Of Mifepristone Abortions Are Meritless.

HB 2 requires physicians to follow the FDA's protocol on the final printed label, but it also provides that "a person may provide, prescribe, or administer the abortion-inducing drug in the dosage amount prescribed by the clinical management guidelines defined by the American Congress of Obstetricians and Gynecologists Practice Bulletin as those guidelines existed on January 1, 2013." TEX. HEALTH & SAFETY CODE § 171.063(b). The plaintiffs say that this provision is unconstitutionally vague because it authorizes physicians to prescribe the "dosage amounts" in the ACOG guidelines without authorizing the ACOG regimen across the board. In the plaintiffs' view, this makes no medical sense because a regimen that combines the ACOG dosage amounts with the FDA protocol is untested. *See* PI Motion 13–14.

There is nothing vague about section 171.063(b)'s allowance; the statute means what it says. A physician "may" use the ACOG dosage amount, but he is not required to. If the plaintiffs do not believe that the ACOG dosage can be administered responsibly alongside the FDA protocol, then they can decline the invitation and adhere to the FDA protocol. The provisions requiring use of the FDA protocol are as clear as can be, and section 171.063(b) does not violate the Constitution by creating an exception that the plaintiffs do not wish to take advantage of.

Even if this Court were to find that section 171.063(b) is unconstitutionally vague, the severability clause would compel this Court to sever that provision from the remainder of HB 2, and allow the remaining regulations of mifepristone abortions to remain in force. The upshot would be a regime that requires abortion providers to adhere to the FDA protocols without *any* allowance or exception. The plaintiffs should be careful what they wish for.

## V.    ATTORNEY GENERAL ABBOTT IS NOT A PROPER DEFENDANT AND SHOULD BE DISMISSED.

In Texas, district attorneys and county attorneys have original jurisdiction to prosecute violations of HB 2. TEX. CODE CRIM. PROC. arts. 2.01, 2.02. House Bill 2, section 2, makes it a misdemeanor for a physician to perform an abortion without the required admitting privileges. It does not, however, give the Attorney General any special authority to prosecute such offenders. The lack of enforcement authority renders Attorney General Greg Abbott, sued in his official capacity, immune from suit. *Okpalobi v. Foster*, 244 F.3d 405, 416 (5th Cir. 2001) (en banc) (requiring state defendants to "have *some connection with the enforcement of the act* and 'threaten and are about to commence proceedings' to enforce the unconstitutional act" before suit is permitted); *see also Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570 (5th Cir. 2012) (challenge to state abortion law suing only the commissioner of DSHS, the executive director of the Texas Medical Board, and a class of district and county attorneys). The Court should dismiss General Abbott as a defendant.

The Court should dismiss Plaintiffs' lawsuit or, alternatively, hold that the challenged provisions do not violate the Constitution.

Date:    October 15, 2013                    Respectfully submitted,

                                             GREG ABBOTT
                                             Attorney General of Texas

                                             DANIEL T. HODGE
                                             First Assistant Attorney General

                                             /s/ Jonathan F. Mitchell
                                             JONATHAN F. MITCHELL
                                             Solicitor General
                                             State Bar No. 24075463

                                             ANDREW S. OLDHAM
                                             Deputy Solicitor General

                                             ARTHUR C. D'ANDREA
                                             BETH KLUSMANN
                                             PHILIP A. LIONBERGER
                                             MICHAEL P. MURPHY
                                             Assistant Solicitors General

                                             OFFICE OF THE ATTORNEY GENERAL
                                             P.O. Box 12548 (MC 059)
                                             Austin, Texas  78711-2548
                                             Tel.: (512) 936-1700
                                             Fax: (512) 474-2697
                                             jonathan.mitchell@texasattorneygeneral.gov

                                             COUNSEL FOR DEFENDANTS
                                             GREGORY ABBOTT, DAVID LAKEY, M.D.,
                                             AND MARI ROBINSON

I certify that on October 15, 2013, this document was served on counsel of record, via the Court's CM/ECF Document Filing System and/or electronic mail.

R. James George, Jr.
Elizabeth von Kreisler
Rico Reyes  *via electronic mail*
GEORGE BROTHERS KINCAID &
HORTON LLP
1100 Norwood Tower
114 West 7th Street
Austin, TX 78701
(512) 495-1400
(512) 499-0094
jgeorge@gbkh.com
evonkreisler@gbkh.com
rreyes@gbkh.com

*Attorneys for all Plaintiffs*

Helene T. Krasnoff
Alice Clapman  *via electronic mail*
Planned Parenthood Federation of America
1110 Vermont Ave., N.W., Suite 300
Washington, D.C. 20005
(202) 973-4800
helene.krasnoff@ppfa.org
alice.clapman@ppfa.org

*Attorneys for Planned Parenthood Plaintiffs*

Janet Crepps  *via electronic mail*
Esha Bhandari  *via electronic mail*
Jennifer Sokoler  *via electronic mail*
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, NY 10005
(864) 962-8519 (Janet Crepps)
(917) 637-3600 (Bhandari & Sokoler)
jcrepps@reprorights.org
ebhandari@reprorights.org
jsokoler@reprorights.org

*Attorneys for Plaintiffs Whole Woman's Health, Austin Women's Health Center, Killeen Women's Health Center, Southwestern Women's Surgery Center, West Side Clinic, Inc., Alan Braid, M.D., Lamar Robinson, M.D., and Pamela J. Richter, D.O.*

Brigitte Amiri  *via electronic mail*
Renée Paradis  *via electronic mail*
ACLU Foundation
Reproductive Freedom Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7897
bamiri@aclu.org
rparadis@aclu.org

Rebecca L. Robertson  *via electronic mail*
American Civil Liberties Union of Texas
1500 McGowen Street, Suite 250
Houston, TX 77004
(713) 942-8146
rrobertson@aclutx.org

*Attorneys for Plaintiffs Routh Street Women's Clinic, Houston Women's Clinic, and Southwestern Women's Surgery Center*

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
Solicitor General